UNITED STATES of America, Appellee,

v.

Brian J. SARAULT, Defendant,
Appellant.

No. 92–1180.

United States Court of Appeals,
First Circuit.

Heard July 28, 1992.
Decided Sept. 15, 1992.

**18**

Kevin J. O'Dea, argued, for appellant.

Edwin J. Gale, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., was on brief, for the U.S.

Before TORRUELLA, Circuit Judge, SELYA, Circuit Judge and ZOBEL, Judge for the District Court of Massachusetts, sitting by designation.

SELYA, Circuit Judge.

In a postscript to a sordid tale of greed and corruption, defendant-appellant Brian J. Sarault, the former Mayor of Rhode Island's fourth largest city, assails the district court's imposition of a sentence exceeding the guideline sentencing range (GSR). Finding, as we do, that the upward departure was fully justified, we affirm the judgment below.

### I

### *Background*

On November 14, 1991, the former mayor of Pawtucket, Rhode Island, pleaded guilty to a criminal information which charged him with heading an enterprise engaged in a pattern of racketeering activity, in violation of the RICO statute, 18 U.S.C. § 1962(c) (1988). The predicate offenses described in the information consisted of fifteen acts of extortion committed in connection with the award of municipal contracts, each in violation of the Hobbs Act, 18 U.S.C. § 1951 (1988). On January 31, 1992, appellant was sentenced to sixty-six months in prison.[1] The court used the November, 1991 version of the sentencing guidelines. *See United States v. Harotunian*, 920 F.2d 1040, 1041–42 (1st Cir.1990) ("Barring any *ex facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.").

We trace the architecture of the sentence step by step. The court began to design the sentence by referring to U.S.S.G. § 2E1.1 which, in respect to a RICO conviction, provides a base offense level of nineteen or, if greater, "the offense level applicable to the underlying racketeering activity." The application notes indicate that, in order to determine which base offense level results in the greater offense level, the court should make the appropriate adjustments under Parts A through D of Chapter Three of the guidelines, using the two base offense levels in turn, and compare the results. U.S.S.G. § 2E1.1, comment. (n. 1). Following this protocol, the court determined that the level nineteen floor would produce the greater adjusted offense level (twenty-five) when all referenced Chapter Three adjustments were implemented.[2] Hence, the court used level nineteen as the starting point in constructing appellant's sentence.

The court then increased the offense level by four to reflect appellant's role as the organizer/leader of an extensive criminal activity, U.S.S.G. § 3B1.1(a); elevated it another two levels to reflect appellant's abuse of a position of public trust, U.S.S.G. § 3B1.3; and, finally, deducted two levels to acknowledge appellant's acceptance of responsibility, U.S.S.G. § 3E1.1(a). The court thus arrived at a net offense level of twenty-three. Inasmuch as appellant had no prior criminal history, the court's calculations produced a GSR of forty-six to fifty-

---

1. Sarault was also sentenced to three years of supervised release, fined $20,000, directed to make restitution in the amount of $80,829, and ordered to pay a $50 special assessment.

2. The base offense level for the Hobbs Act violations was ten. *See* U.S.S.G. §§ 2C1.1, 2E1.5. After making the interim adjustments described in the Application Note, the adjusted offense level would have been twenty-four.

seven months. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

This brings us to the heart of the matter. After settling upon the GSR, the district judge departed therefrom and sentenced Sarault to a prison term that exceeded the high end of the GSR by nine months. The judge linked the upward departure to the significant disruption of governmental functions that attended appellant's antics.

On appeal, Sarault challenges only the upward departure. He does not contest any of the sentencing court's interim calculations.

## II

### Standard of Review

Our review of sentencing departures is governed by the tripartite methodology set forth in *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). We have summarized the methodology as follows:

> First, we evaluate the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. If the stated circumstances pass muster, we proceed to the next rung and determine whether those circumstances were adequately documented. After the first two levels are climbed, the departure must be measured by a standard of reasonableness. On the third tier, the district court's leeway is substantial.

*United States v. Aguilar–Pena*, 887 F.2d 347, 350 (1st Cir.1989) (citation omitted). ■ At the first step of departure analysis, appellate review of the district court's determination is plenary. At the second step, appellate review is for clear error. At the final step, we review the extent of the departure for reasonableness. *See Diaz–Villafane*, 874 F.2d at 49. Throughout, we remain mindful that a departure is appropriate only when "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988).

## III

### Analysis

#### A.

The sentencing court based its upward departure on U.S.S.G. § 5K2.7, which provides:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.

U.S.S.G. § 5K2.7. Sarault argues that the second sentence of section 5K2.7 is applicable here, and that the circumstances attendant to his malefactions are not sufficiently extraordinary to overcome the strong presumption that the GSR reflects the appropriate range of punishment. We disagree with this analysis.

■ As the guideline implies, if appellant had been charged with, and sentenced on the basis of, the substantive crime of extortion in violation of the Hobbs Act, an upward departure would not be sustainable unless the disruption was so atypically great as to exceed the level of interference inherent in the offense. *Compare, e.g., United States v. Riviere*, 924 F.2d 1289, 1308–09 (3d Cir.1991) (reversing upward departure under § 5K2.7 where disruption of governmental function was no greater than that normally associated with the underlying offense of assault on a federal marshal); *United States v. Goodrich*, 919 F.2d 1365, 1369 (9th Cir.1990) (reversing upward departure under § 5K2.7 where govern-

mental disruption was no greater than that which normally accompanied the crime of perjury); *and United States v. Barone,* 913 F.2d 46, 51 (2d Cir.1990) (reversing upward departure under § 5K2.7 because disruption of governmental function was inherent in the offenses of conviction, viz., tax evasion and perjury) *with, e.g., United States v. Kramer,* 943 F.2d 1543, 1550 (11th Cir.1991) (upholding § 5K2.7 departure where defendant's attempted jailbreak resulted in the crash of a helicopter in the prison yard, disrupting the normal functioning of the prison "far beyond the level of … a run-of-the-mill escape attempt"), *petition for cert. filed,* 60 U.S.L.W. 3816 (U.S. Apr. 30, 1992) (No. 91–1848); *United States v. Roth,* 934 F.2d 248, 251 (10th Cir.1991) (upholding upward departure under § 5K2.7 where defendant's theft of government property was unusually extensive); *and United States v. Garcia,* 900 F.2d 45, 49 (5th Cir.1990) (upholding upward departure under § 5K2.7 where defendant's mail theft was on so grand a scale that the resulting disruption of service was well beyond that normally associated with the crime). In this case, however, we. need not undertake the qualitative scrutiny demanded by the second sentence of section 5K2.7.[3]

■ U.S.S.G. § 5K2.7 must be applied to charged crimes on a categorical basis. Sarault was not charged directly with the predicate Hobbs Act offenses. Rather, he was charged with, convicted of, and sentenced on the basis of, racketeering. In categorical terms, racketeering is not a crime that fits within the second sentence of section 5K2.7. Although a RICO enterprise can, as here, be conducted so as to impair the functioning of a governmental unit, that element is by no means "inherent in the offense" of racketeering. To the contrary, RICO violations come in many different shapes, sizes, and manifestations—most of which do not involve direct impedance of any governmental operations.

Nor does it assist Sarault's cause that the RICO charge in this case rests on a series of Hobbs Act violations. Section 5K2.7 requires us to take a categorical approach. We cannot, therefore, overlook the forest (the offense of conviction, on which the sentence was based) to focus on individual trees (the predicate acts described in the charging papers). Moreover, this court has held, squarely and recently, that RICO, as an offense of conviction on which a sentence is based, does not bring with it the inherent characteristics of the underlying predicate acts described in the charging papers. *See United States v. Butt,* 955 F.2d 77, 89 (1st Cir.1992) (§ 2E1.1(a)(1) establishes "a *generic* base offense level for RICO crimes, one that 'includes' no particular offense characteristic or special skill").

In sum, the first sentence of section 5K2.7, rather than the second sentence, controls in this case. Under that rubric, a district court may depart upwardly if it supportably finds that the defendant's criminal conduct caused "a significant disruption of a governmental function." U.S.S.G. § 5K2.7. Hence, the initial prong of the *Diaz–Villafane* test is satisfied in this instance.

**B.**

■ As we have already mentioned, the district court premised its departure from the GSR on what it perceived to be a significant disarticulation of Pawtucket's city government resulting from appellant's extortion scheme. The court enumerated several ways in which this disruption manifested itself. It would serve no useful purpose to repeat the district court's mantra. For present purposes, it suffices that the court excoriated, among other things, the wholesale derangement of the city's bid processes caused by the mayor's prodigious appetite for extortionate payments. This factor alone supports the court's finding that a

---

**3.** We express no opinion on whether the squalid circumstances of this case were sufficiently unusual to permit a departure under the more restrictive standard contemplated by the second sentence of section 5K2.7.

significant disruption occurred. We explain briefly.[4]

A city must purchase supplies and services in order to fulfill its rudimentary obligations to its inhabitants. In this case, it is clear that appellant conspired with his chief aide and the city's acting director of public works to prey on municipal vendors, extorting payments from businesses that were interested in obtaining municipal contracts and extracting kickbacks from businesses that had succeeded in obtaining municipal contracts. Sarault and his cohorts instructed those who agreed to play along how bids and change orders should be prepared. On occasion, they suggested that bids be inflated to cover the cost of the illegal payments. One general contractor, for example, was told "not to bid on any [City of Pawtucket] job without first ... adding '10% for the mayor.'"

The charging papers allude to fifteen separate incidents in which city contractors were asked to make extortionate payments. The PSI Report affords detailed accounts of these meretricious encounters. The record makes it painfully plain that the web of corruption was much more widespread; in the sentencing court's words, appellant "systematically shook down vendors on a regular basis for a period spanning at least two years, and for an amount that was at least $250,000." Based on the tawdry record in this case, the court's finding is unimpugnable.

We will not paint the lily. Sarault's scheme was suffusive; it engulfed city government. As the district court accurately observed, appellant's actions "distorted the process of awarding bids for Public Works projects from one which is supposed to see that the lowest responsible bidder gets the job, to one that resulted in the bidder who was most willing to play ball getting the job." It follows from this supportable finding that appellant was responsible for a significant disruption of the City's governmental functions. Put bluntly, he threw a large monkey wrench into a vital cog in the machinery of Pawtucket's operations. His brazen conduct constituted an aggravating circumstance not adequately taken into account in framing the sentencing guidelines for RICO cases—a circumstance that distinguished his case from the mine-run of RICO violations and validated an upward departure.[5]

### C.

■ We turn next to the third part of the required *Diaz–Villafane* analysis. The nine-month upward departure represents an increase of approximately fifteen percent in the appellant's sentence. Although this court has not previously had occasion to assess the reasonableness of a section 5K2.7 departure, other courts have upheld departures of a far greater magnitude where U.S.S.G. § 5K2.7 is in play. *See, e.g., United States v. Hatch*, 926 F.2d 387, 397–98 (5th Cir.) (upholding § 5K2.7 departure of ten months where defendant's fraud deprived the parish of a significant portion of its budget and undermined confidence in law enforcement; high end of GSR was fourteen months), *cert. denied*, —— U.S. ——, 111 S.Ct. 2239, 114 L.Ed.2d 481 (1991); *United States v. Murillo*, 902 F.2d 1169, 1171, 1174 (5th Cir. 1990) (upholding § 5K2.7 departure of

---

**4.** Because this case was resolved on a guilty plea, we draw the facts from appellant's admissions, the uncontested portions of the presentence investigation report (PSI Report), and transcripts of the hearings below. *See, e.g., United States v. Garcia*, 954 F.2d 12, 14 (1st Cir.1992); *United States v. Dietz*, 950 F.2d 50, 51 (1st Cir.1991).

**5.** Although we need not discuss the other dislocations caused by Sarault's behavior, we detour briefly in order to mention the district court's comment that appellant's inability to function effectively as mayor during the period between his arrest and his eventual resignation contrib-

uted to the disruption of city government. In the clear light of hindsight, it is easy to criticize the appellant for causing further pain to his community by continuing in office. But, we question whether his failure to resign at an earlier date can provide a legitimate basis for an upward departure. One of the most fundamental tenets of our system of justice is the presumption of innocence. This presumption would be substantially undermined if an officeholder's failure to resign when he was first arrested could, in and of itself, support an upward departure.

twenty-seven months where defendant's sale of illegal immigration papers disrupted government amnesty program; high end of GSR was twenty-one months); *cf. Roth,* 934 F.2d at 252 (remanding § 5K2.7 departure of eighty-three months for further explanation of degree of departure; high end of GSR was thirty-seven months). In light of the extensive and pervasive nature of appellant's scheme, its ubiquity, its duration, the amount of booty involved, and the havoc occasioned in Pawtucket, we believe that a nine-month upward departure was well within the realm of reasonableness.

## IV

### *Conclusion*

We need go no further. It is difficult to overstate the gravity of Sarault's offense. He betrayed the trust of the citizens of Pawtucket, abused the high office to which he had been elected, pressured municipal vendors, and relentlessly pursued emoluments to which he was not entitled. Beyond question, Sarault's course of conduct seriously disrupted the normal functioning of a vital arm of city government. In these sorry circumstances, the sentencing court did not err in formulating and imposing a modest upward departure.

*Affirmed.*