United States Court of Appeals,

Eleventh Circuit.

No. 94-8334.

UNITED STATES of America, Plaintiff-Appellee,

v.

Chester L. GUNBY, Defendant-Appellant.

May 22, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 5:91-60-CR-MAC(WDO)), Wilbur D. Owens, Jr., Judge.

Before TJOFLAT and BIRCH, Circuit Judges, and SMITH[*], Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Appellant, Chester L. Gunby, pleaded guilty to one count of mail fraud, 18 U.S.C. § 1341 (1994), and one count of tax fraud, 26 U.S.C. § 7206(1) (1994), for embezzling the filing fees collected by the Magistrate Court of Baldwin County, Georgia. The district court found that Gunby's criminal activities constituted "a significant disruption of a governmental function" under Sentencing Guidelines section 5K2.7, and it therefore departed upward from the recommended sentencing range of 21 to 27 months. *See* United States Sentencing Commission, *Guidelines Manual,* § 5K2.7, p.s. (Nov. 1, 1993). The district court sentenced Gunby to concurrent terms of forty-one months for his mail fraud conviction and thirty-six months for his tax fraud conviction. Gunby now appeals, challenging the applicability of guideline section 5K2.7 to his case and the sufficiency of the evidence supporting the upward

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

departure.  We affirm.

I.

A.

The Georgia General Assembly established the Small Claims Court of Baldwin County, Georgia, in 1967.  *See* Act of Apr. 21, 1967, No. 588, § 1, 1967 Ga. Laws 3312, 3313.  Gunby was appointed by Governor Busbee as Judge of the Small Claims Court of Baldwin County in 1975.  The Small Claims Court operated on the basis of fees collected from litigants and from the city for the use of the court's services.  These collections paid for the expenses of the court, and judges such as Gunby were entitled to keep the surplus for themselves.  *See* § 5.

Popular discontent and constitutional problems[1] with the fee system led the Georgia Assembly to phase out fees and phase in salary compensation for Georgia's judges.  With respect to Gunby, the first step was the creation of magistrate courts.  In 1977, the legislature created a magistrate court in Baldwin County.  *See* Act of Mar. 23, 1977, No. 388, § 1, 1977 Ga. Laws 3197, 3198.  According to this statute, the Judge of the Small Claims Court was

---

[1] In 1977, the Supreme Court held in *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977), that Georgia's system of paying justices of the peace for the issuance of search warrants violated the Fourth and Fourteenth Amendments to the United States Constitution.  *See id.* at 251, 97 S.Ct. at 549. The Court found that justices of the peace who receive no salary and who earn their living based on the fees they collect from issuing criminal warrants cannot not be neutral and detached, as the Fourth Amendment requires.  *See id.* at 249, 97 S.Ct. at 548. In response, the Georgia Assembly repealed the provision authorizing the collection of a fee for *issuing* a warrant, and replaced it with a provision authorizing the collection of a fee for *examining* the application for a warrant.  *See* Act of Feb. 25, 1977, No. 74, § 1, 1977 Ga. Laws 197, 197.

to serve as the Magistrate of Baldwin County. *See* § 2. In 1977, Gunby was the Judge of the Small Claims Court, and he therefore became the Magistrate of Baldwin County as well. Under the 1977 Act, Gunby was paid a salary from the treasury of Baldwin County for serving as a magistrate. *See* § 7. Still, the 1977 Act apparently left unchanged the proprietary nature of the local court system. For example, the Magistrate of Baldwin County was required to pay the expenses of the court from his own salary. *See* § 8. By implication, Gunby could continue to profit from the court's operations.

In 1982, however, the Georgia Assembly replaced the fee system with a salary system for all local courts. *See* Courts of Limited Jurisdiction Compensation Act of 1982, No. 1488, 1982 Ga. Laws 1737 (repealed 1983).[2] The 1982 act required each county to elect one of two systems for paying a salary to any judge who "is compensated, in whole or in part, from fees." § 2(1). Under compensation plan "A," the county would pay each judge a fixed salary, and the judges would remit all the fees they collected to the county treasury. *See* § 5. Under compensation plan "B," the court would establish a trust fund from which an equal salary would be paid to all fulltime judges. *See* § 6. Each judge would account for all collected fees and remit them to the trust fund. § 6(c). It is unclear which system of compensation Baldwin County adopted for its small claims and magistrate courts, but neither system

---

[2]This act applied to Baldwin County because it contained "a court ... in which the judge ... is compensated in whole or in part by fees charged and collected for the performance of the duties of [the] court." § 3. The act applied to Gunby because he was a judge of a small claims court. § 2(4).

envisioned the retention of fees by judges.

In 1983, the Georgia legislature adopted a local law concerning the Baldwin County Magistrate Court. *See* Act of Mar. 14, 1983, No. 157, 1983 Ga. Laws 4027. First, the act created the position of chief magistrate. § 2(a). Gunby was soon appointed to this position. Second, the act provided for the creation of a magistrate court treasury: "All fees collected by the Magistrate Court of Baldwin County shall be paid into a depository at a chartered bank designated by the governing authority of Baldwin County." § 5(a). From the treasury, the chief magistrate was to pay his own salary and the salaries of the other magistrates and court personnel. *Id.* The act also stated, "The chief magistrate shall be placed on an annual salary, the amount of which shall be determined by the governing authority of Baldwin County." § 4(a). In short, by March 14, 1983, Gunby's jobs as small claims court judge and magistrate judge were both salaried positions, and Gunby was no longer entitled to pocket the fees collected by either court.

The 1983 Georgia Constitution abolished the small claims courts. Article 6 of the 1983 Constitution vested state judicial power exclusively in the magistrate courts, probate courts, juvenile courts, state courts, superior courts, Court of Appeals, and Supreme Court of Georgia. Ga. Const. art. 6, § 1, ¶ 1 (1983). By implication, the small claims courts were eliminated. *See Porter v. Calhoun County Bd. of Comm'rs,* 252 Ga. 446, 314 S.E.2d 649, 651 (1984). Thus, after 1983, Gunby ceased to be a judge of the Small Claims Court and was only the Chief Magistrate of Baldwin

County.

Later in 1983, the Georgia Assembly adopted a uniform system of compensation for the magistrate courts: "Magistrates shall be compensated solely on a salary basis and not in whole or in part from fees...." Act of Mar. 18, 1983, No. 429, § 2-1, 1983 Ga. Laws 884, 890 (codified as amended at O.C.G.A. § 15-10-23(d) (Supp.1996)). The 1983 act repealed the 1982 act, see § 7-1, 1983 Ga. Laws at 928, and therefore left local courts no choice about how to structure their salary plans. Instead of paying a fee to the magistrate for the service of a civil complaint upon an opposing party, for example, plaintiffs were required to pay "the actual cost of serving each party required to be served." § 2-1, 1983 Ga. Laws at 899 (codified as amended at O.C.G.A. § 15-10-80(b) (1994)). Under the 1983 Act, the only permissible form of compensation for a judge was a salary from the county, and judges were not to charge filing fees in excess of costs.[3]

In conclusion, Gunby started his judicial career as Judge of the Small Claims Court of Baldwin County. In this capacity, he was

---

[3]Gunby has continued to argue that the 1983 local law concerning the financial structure of the Magistrate Court of Baldwin County clothed his illicit activities in a cloak of respectability—despite the 1983 general law prohibiting the conversion of fees by magistrate judges. The 1983 local law, however, simply authorizes the creation of a bank account for the magistrate court; it does not authorize the chief magistrate to pocket the fees of litigants.

Even assuming that it did, this local law was approved on March 14, 1983; the 1983 general law explicitly barring such conduct was approved on March 18, 1983, four days later. Section 8-3 of the later statute provides that "[a]ll laws and parts of laws in conflict with this Act are repealed." § 8-3, 1983 Ga. Laws at 929. Thus, Gunby cannot suggest that he was acting in good faith reliance the 1983 local law.

authorized to profit from the operation of his court by charging fees in excess of costs and pocketing the difference. By 1983, however, this system had changed entirely. Gunby was no longer the Judge of the Small Claims Court. He was Chief Magistrate of the Magistrate Court of Baldwin County. This position entitled Gunby to no more than a salary set by Baldwin County. Gunby was no longer authorized to profit from the operation of his court.

B.

The new arrangement apparently did not suit Gunby. He devised two schemes to circumvent the laws limiting his compensation to a fixed salary. Both schemes involved siphoning off the surplus generated by the collection of fees paid by civil litigants who filed suit in Baldwin County. The first scheme centered on a sole proprietorship organized by Gunby that ostensibly engaged in the business of serving process on defendants.

As Chief Magistrate of Baldwin County, Gunby set the price for filing a civil complaint in Baldwin County at $20. The actual cost of delivering the complaint and a summons to the defendant was approximately $8. Under O.C.G.A. § 15-10-80(b), Gunby therefore should have only charged $8. Instead, Gunby charged $20 and channeled the remaining $12 into his own pocket.

Each $20 filing fee was deposited in the treasury of the Magistrate Court of Baldwin County, as directed by the 1983 local law. The court's treasury consisted of an account at the Citizen and Southern Bank of Milledgeville ("C & S Bank"). Gunby and his wife, who was also an employee of the magistrate court, were the only persons authorized to handle the funds in the C & S Bank

account.

On June 9, 1983, Gunby and his wife opened an account in the name of the "G & G Constable Service" ("G & GCS") at the First Federal Savings and Loan Association ("First Federal").  On July 1, 1983, they began to withdraw funds from the court's account at C & S Bank and to deposit them into the G & GCS account at First Federal.  From the G & GCS account, the Gunbys then paid two constables to serve process on the parties specified in each complaint.  Gunby paid the constables $8 per complaint, leaving the remaining $12 in the G & GCS account.

The last deposit into the First Federal account was made on January 6, 1986.  On January 15, 1986, Gunby and his wife opened a different account in the name of G & GCS at the Exchange Bank and began to deposit funds from the court's account into the Exchange Bank account.  In early February, 1986, the Judicial Qualifications Commission of Georgia (the "JQC") started an investigation of Gunby based on allegations of corruption and nepotism in the Magistrate Court of Baldwin County.  On February 25, 1986, the Gunbys closed the First Federal account.

The JQC investigation concluded some time during the spring of 1986.  The last deposit into the G & GCS account at the Exchange Bank was made on April 2, 1986, and the Gunbys closed the Exchange Bank account on May 9, 1986.  Gunby apparently closed the G & GCS bank accounts in response to the JQC investigation.  By the time they closed these accounts, Gunby and his wife had transferred to the G & GCS accounts essentially all of the $20 filing fees paid by plaintiffs in Baldwin County for a three-year period.

In July 1983, soon after they began to transfer money from the court's account to the G & GCS accounts, Gunby and his wife began to withdraw money for their own personal benefit from the G & GCS accounts. The Gunbys transferred some of the money into their personal checking and savings accounts and some into a money market account. Gunby financed an individual retirement account for himself using funds from the G & GCS accounts. Other funds from the G & GCS accounts went into the Gunbys' business ventures. They also cashed several checks written on the G & GCS accounts. These withdrawals continued until May 9, 1986, when Gunby transferred the last $17,067 from the G & GCS account at the Exchange Bank to the Gunbys' own joint checking account at the same bank. In all, from July 1983 to May 1986, Gunby and his wife withdrew $165,967 from the G & GCS accounts for their own personal benefit. The withdrawals represented the difference between the amount charged to prospective litigants and the expense of actually serving the legal papers on behalf of those litigants.

The second scheme devised by Gunby involved two bogus retirement accounts created once again to siphon off the resources of the magistrate court. After the conclusion of the JQC investigation in the spring of 1986, Gunby allowed funds to accumulate in the treasury account of the magistrate court until March 1988. At that time, Gunby and his wife consulted with an attorney for the Merchants and Farmers Bank ("M & F Bank") about opening two purported retirement accounts for court employees. After this consultation, Gunby and his wife, as co-signatories, opened two accounts at the M & F Bank. When Gunby and his wife

opened these two accounts, Gunby caused the bank to mail to his personal address an Internal Revenue Service Form 1099 for the calendar year 1989. This form was part of the paperwork required to open the bogus retirement accounts.

The Gunbys opened the "Magistrate Court of Baldwin County Money Purchase Pension Plan, Account No. 041," (the "qualified account") in March 1988. Between March 28, 1988, and September 26, 1990, Gunby transferred $21,250 from the court's account at C & S Bank to the qualified account at the M & F Bank. In May 1988, the Gunbys opened the "Magistrate Court of Baldwin County Non-Qualified Deferred Retirement Plan, Account No. 040" (the "nonqualified account"). Between May 1988 and September 1990, the Gunbys transferred $216,000 from the C & S Bank account to the nonqualified account. Thus, Gunby deposited a total of $237,250 into the two retirement accounts. The deposited funds again represented the difference between the amount charged to prospective litigants and the actual court costs of serving complaints.

According to the documents establishing the qualified account, employees of the magistrate court could participate in the plan after one year of employment, but vesting would not occur until after five years of employment. The only court employees that met the vesting requirement were the Gunbys. In fact, none of the other employees at the magistrate court knew of the existence of the qualified plan, and no employees were ever permitted to contribute to the plan. With regard to the nonqualified account, Gunby had sole control of the funds in the account and directed the

bank's investment of the account's funds. In his financial statements, Gunby listed the funds in the two accounts as personal assets. In other words, the amounts deposited into the two accounts were intended for the Gunbys' sole, private benefit. When the Gunbys' two schemes are combined, they embezzled approximately $403,217 from the taxpayers of Baldwin County.[4]

To hide this illicit income, Gunby filed several fraudulent tax returns. For example, on October 31, 1990, Gunby and his wife filed a joint tax return for the year 1989 which substantially under-reported their income. On audit, the Internal Revenue Service determined Gunby's joint taxable income to have been $195,087.51, but on his return Gunby stated that his joint taxable income was $117,709, a difference of $77,378.51. Accordingly, Gunby cheated the government out of $25,227 in taxes in 1989 alone. Overall, from 1984 to 1989, Gunby understated his income by an estimated $309,361.53, thus defrauding the United States of $86,621.23 in taxes.

## C.

On September 27, 1991, a grand jury indicted Gunby and his wife for tax fraud. *See* 26 U.S.C. § 7206(1) (1994). On January 21, 1993, the grand jury returned a superseding, twenty-seven count indictment against the couple. The indictment alleged not only tax fraud, but also conspiracy, *see* 18 U.S.C. § 371 (1994), embezzlement from a recipient of federal funding, *see* 18 U.S.C. § 666 (1994), mail fraud, *see* 18 U.S.C. § 1341 (1994), money

---

[4]The district court also found that Gunby drew a salary of $315,735 from 1983 to 1990. Thus, Gunby himself ended up with a total of $718,952 from the coffers of the magistrate court.

laundering, *see* 18 U.S.C. § 1956(a)(1)(A) (1994), racketeering, *see* 18 U.S.C. § 1962(c) (1994), and engaging in unlawful financial transactions, *see* 18 U.S.C. § 1957(a) (1994). The defendants filed several motions to dismiss various counts of the indictment, but the district court denied these motions on April 8, 1993. On November 5, 1993, Gunby entered into a plea agreement with the Government.

The agreement provided, in pertinent part, that Gunby would plead guilty to one count of mail fraud and one count of tax fraud. The mail fraud count stemmed from Gunby's use of the mail to receive the form 1099 with which he established the sham retirement accounts at the M & F Bank. Gunby's fraudulent 1989 tax return gave rise to the tax fraud count. The plea agreement also stated that Gunby "understands and has discussed with his attorney that ... the Court has the authority under certain circumstances to impose a sentence that is more severe ... than the sentence called for by the [sentencing] guidelines." Gunby signed this agreement. In accordance with the plea agreement, Gunby was convicted of the two pertinent counts, and the Government dismissed the remaining charges against him.[5]

Gunby was sentenced on March 17, 1994. At the sentencing hearing, the district court made several findings of fact, based in part on the presentence report (the "PSR") prepared by the court's probation office.[6] The court first noted the "tremendous concern"

---

[5] Gunby's wife also pleaded guilty to one count of tax fraud. The district court sentenced her to a term of imprisonment within the guideline range, and she did not appeal.

[6] Gunby did not object to any part of the PSR.

this case had caused in Baldwin County.  The court explained that the magistrate courts were created as part of an effort by the Georgia legislature to abolish the fee-based compensation system, a system which had engendered "public dissatisfaction."  The court reviewed the 1983 legislation described above, and concluded that it clearly and unambiguously proscribed the collection of fees by judges such as Gunby.  The court found that Gunby's two schemes had defrauded the taxpayers of Baldwin County of $403,217 and had affected 33,601 civil complaints filed in Baldwin County.  The court then stated,

> [T]he worst part of this entire case, ladies and gentlemen, in the Court's best judgment, is that it has put a black eye upon the public's perception of the courts in Baldwin County, in general, and in particular, upon the magistrate's court.  Can you imagine what the 33,601 people who were sued in this court must be thinking?  They must be wondering, "Did I get justice"?

In response to a colloquy with defense counsel, the court also stated,

> Nobody's suggesting that the papers, once they were given to the Magistrate Court, were not processed efficiently.  That's not the issue....  The disruption I'm referring to is the black eye that justice has received, the injury to the reputation of the court system and the magistrate court in particular.  The public can't believe in justice when the judge and his wife, employed by the court, themselves are utilizing the court for their personal, illegal benefit.

The district court then departed upward from a total offense level of 16 to an offense level of 20.  This departure increased the sentencing range from 21-27 months to 33-41 months.  The court sentenced Gunby to forty-one months.[7]  Gunby took this appeal,

---

[7]The district court also sentenced Gunby to a three-year term of supervised release and ordered him to pay a fine ($50,000), the costs of his incarceration ($127,606.40), an amount of restitution ($167,967) to be paid to Baldwin County,

challenging the court's upward departure.

## II.

### A.

Under 18 U.S.C. § 3553(b), the district court may impose a sentence outside the range established by the applicable guidelines if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1994). This court has applied a three-part test to determine whether an upward departure complies with § 3553(b):

(1) Was the aggravating circumstance cited by the district court adequately taken into consideration by the Sentencing Commission in formulating the guidelines?

(2) If adequate consideration was not given to the circumstance, was consideration of the circumstance consistent with the goals of the sentencing guidelines?

(3) If the circumstance was properly taken into account, was the extent of the departure from the guideline range reasonable?

*United States v. Shuman*, 902 F.2d 873, 875-76 (11th Cir.1990).[8]

### 1.

The district court here based its upward departure on the

---

and a special assessment ($100). Gunby does not challenge these aspects of his sentence.

[8]We view the *Shuman* test in this case as entirely consistent with the Supreme Court's decision in *Koon v. United States*, --- U.S. ----, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

policy statement contained in U.S.S.G. § 5K2.7.  This departure

guideline provides as follows:

> If the defendant's conduct resulted in a significant
> disruption of a governmental function, the court may increase
> the sentence above the authorized guideline range to reflect
> the nature and extent of the disruption and the importance of
> the governmental function affected.  Departure from the
> guidelines ordinarily would not be justified when the offense
> of conviction is an offense such as bribery or obstruction of
> justice;  in such cases interference with a governmental
> function is inherent in the offense, and unless the
> circumstances are unusual the guidelines will reflect the
> appropriate punishment for such interference.

U.S.S.G. § 5K2.7, p.s.

The purpose of section 5K2.7, like the other seventeen

departure guidelines listed in subpart 2 of chapter 5K,[9] is "to aid

the court by identifying some of the factors that the Commission

has not been able to take into account fully in formulating the

guidelines." U.S.S.G. § 5K2.0, p.s.  According to policy statement

U.S.S.G. § 5K2.0, this list of factors is non-exclusive.  In other

words, provided that they follow the requirements of 18 U.S.C. §

3553, sentencing courts may depart from the recommended sentencing

range for the reasons enumerated in chapter 5K or for other,

---

[9]When reviewing a sentence on appeal, we generally apply the
guidelines in effect on the date the appellant was sentenced.
*See United States v. Shields,* 87 F.3d 1194, 1196 n. 2 (11th
Cir.1996) (en banc).  However, subsequent amendments that clarify
a guideline, rather than make substantive changes, should be
considered on appeal regardless of the date of sentencing.  *See
United States v. Stinson,* 30 F.3d 121, 122 (11th Cir.1994) (per
curiam).

Because Gunby was sentenced on March 17, 1994, we apply
the guidelines from the 1993 manual.  We note that § 5K2.7
has not been amended since 1993.  The policy statement
contained in § 5K2.0, however, has been amended, and two
departure guidelines, §§ 5K2.17 and 5K2.18, have been added
since 1993.  Because we construe the changes to § 5K2.0 to
be clarifying amendments, we discuss the most recent version
of this provision.

unenumerated reasons.

Regardless of which type of departure the district court made, this court must consider whether the guidelines used to calculate the sentence, such as the base offense level and the upward adjustments, adequately accounted for the reprehensibility of the defendant's conduct. *See, e.g., United States v. Kramer*, 943 F.2d 1543, 1550 (11th Cir.1991) (per curiam) (holding that "the offense of escape or instigating or assisting an escape does not adequately take into account disruption of a governmental function"), *cert. denied,* 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992). Our review of this question, however, is much more straightforward when the district court departs under a specific guideline such as section 5K2.7 than when it departs under an unenumerated factor.

First, we know from the text of policy statement 5K2.0 that, at very least, the Commission *did not* take the significant disruption of a governmental function into account in calculating the sentencing range for *some* offenses. Thus, the Commission might not have taken this factor into account when calculating the sentencing range for fraud. Second, we know from section 5K2.7 itself that the Commission *did* take into account the ordinary disruption of a governmental function in calculating the sentencing ranges for bribery and obstruction of justice. We can infer from the mention of these two offenses that, if the Commission wanted to preclude the application of section 5K2.7 to fraud, it could easily have done so. It did not. Third, we know from the text of section 5K2.0 that section 5K2.7 can apply to theft that involves the significant disruption of a governmental function. *See* U.S.S.G. §

5K2.0, p.s.  Theft is an offense similar in many respects to fraud, especially where, as here, the underlying conduct involved embezzlement and the concealment of the ill-gotten gain. [10] Therefore, the text of the sentencing guidelines strongly suggests that section 5K2.7 applies to Gunby's fraud convictions.

Nevertheless, Gunby claims that the guidelines used in calculating his sentence fully accounted for the harmfulness of his conduct.  He contends that the base offense level for mail fraud, *see* U.S.S.G. § 2F1.1(a), the specific offense characteristic of a $403,217 loss to Baldwin County, *see* U.S.S.G. § 2F1.1(b)(1)(J), and the upward adjustment for his abuse of public trust, *see* U.S.S.G. § 3B1.3, accounted for whatever disruption of a governmental function his actions caused.  He argues that the significant disruption of a governmental function is inherent in the nature of a large-scale fraud involving a breach of public trust.  We reject this contention.

Most fraudulent schemes do not disrupt the functioning of any

---

[10]The guideline applicable to theft is U.S.S.G. § 2B1.1. Thus, the statement in § 5K2.0 that § 5K2.7 can apply to theft involving the significant disruption of a governmental function means that the Commission did not take into account the significant disruption of a governmental function in formulating § 2B1.1.  Section 2B1.1 also covers embezzlement.  Therefore, by necessary implication, the Commission did not take into account the significant disruption of a governmental function in calculating the offense level for embezzlement.  Gunby apparently admits that pocketing the court's filing fees constituted embezzlement, and even if he did not, we consider the elements of embezzlement to resemble those of fraud more closely than the elements of bribery or obstruction of justice.  *Compare, e.g., United States v. Burton,* 871 F.2d 1566, 1570 (11th Cir.1989) (listing the elements of embezzlement under 18 U.S.C. § 641) *with Pelletier v. Zweifel,* 921 F.2d 1465 1498-99 (11th Cir.) (describing the elements of mail and wire fraud), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).

governmental organization. For example, a stockbroker could defraud investors for years without impeding the operation of any governmental entity. Because fraud and the significant disruption of a governmental function are analytically distinct, a sentencing court can apply sections 2F1.1(a) and 5K2.7 simultaneously. *See, e.g., United States v. Root,* 12 F.3d 1116, 1122 (D.C.Cir.1994) (affirming a district court's application of § 5K2.7 to conduct covered under § 2F1.1(a)). Similarly, an abuse of public trust does not automatically entail the disruption of a governmental function. For instance, an IRS employee could abuse her position of trust by surreptitiously examining her neighbor's tax return, but this crime would not necessarily involve the disruption of a governmental function. Because an abuse of public trust and the disruption of a governmental function are analytically distinct, a sentencing court can apply sections 3B1.3 and 5K2.7 simultaneously. *See, e.g., United States v. Sarault,* 975 F.2d 17, 22 (1st Cir.1992) (affirming a district court's application of §§ 5K2.7 and 3B1.3 to the same criminal conduct). Therefore, the significant disruption of a governmental function is not inherent in the offense of large-scale fraud involving an abuse of public trust, and sections 2F1.1(a), 3B1.3 and 5K2.7 can all apply to Gunby's fraudulent conduct.[11] *See, e.g., United States v. Hatch,* 926 F.2d 387, 397

---

[11]We draw a similar conclusion regarding U.S.S.G. § 2T1.1, the guideline used to calculate the base offense level for Gunby's tax-fraud conviction. The only case where we have applied § 5K2.7 is *United States v. Kramer,* 943 F.2d 1543 (11th Cir.) (per curiam), *cert. denied,* 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992). In *Kramer,* the appellants were convicted of several offenses related to a failed prison escape. Using a helicopter, one of the appellants attempted to airlift another of the appellants from an exercise yard in the Miami Correctional

(5th Cir.1991) (affirming a district court's application of all three sections to the same underlying conduct). We hold that the base offense and adjustment guidelines applied to Gunby do not adequately take into consideration the aggravating circumstance cited by the district court and described in § 5K2.7.[12]

_____

Center. The helicopter crashed into a prison fence on takeoff, severely injuring both pilot and passenger. The district court departed upwards based in part on § 5K2.7, and we affirmed the appellant's sentences.

The district court in *Kramer* had applied § 2P1.1 to determine the base offense level for the appellants' escape attempt. *See id.* at 1547. We noted on appeal that § 2P1.1 does not provide an upward adjustment for the disruption of a governmental function. *See id.* at 1550. We found, by contrast, that § 2P1.3, a neighboring guideline, did call for an upward adjustment when a prison riot involving the defendant causes a major disruption in the operation of the prison. *See id.* We concluded, based on negative implication, that the Commission did not adequately take into account the disruption of a governmental function in § 2P1.1.

None of the guidelines neighboring § 2F1.1 allows an upward adjustment for the disruption of a governmental function. However, one of the guidelines in the vicinity of § 2T1.1, the base offense guideline applied to Gunby's tax-fraud conviction, does call for such an upward adjustment where "the conduct was intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue." U.S.S.G. § 2T1.9. Following the reasoning of *Kramer,* we find that the consideration of this factor in § 2T1.9 indicates that § 2T1.1 does not adequately take into consideration the significant disruption of a governmental function. Therefore, §§ 2T1.1 and 5K2.7 can apply simultaneously.

[12]Gunby cites *Sarault* for the proposition that "a 5K2.7 departure [is] inappropriate, even if there [is] governmental disruption, unless the extent of the disruption [is] significantly beyond that which would normally be associated with the underlying crime." First, our acceptance of this proposition would render § 5K2.7 superfluous, because in effect we would have to assume that all applicable offense guidelines and adjustments already account for the significant disruption of a governmental function. Section 5K2.0 flatly contradicts this false

2.

We next consider whether consideration of the significant disruption of a governmental function would comport with the goals of the sentencing guidelines. Where the guidelines themselves specify the ground of departure cited by the district court, we need not plumb the depths of other guidelines to answer this question. The sentencing guidelines themselves listed the significant disruption of a governmental function as a ground for departure in section 5K2.7. Therefore, we hold that consideration of this factor by the district court was consistent with the goals of the sentencing guidelines. *See Koon v. United States,* --- U.S. ----, ----, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996).

3.

We must also decide whether the district court's upward departure was reasonable under the circumstances. *See Shuman,* 902 F.2d at 876. The district court increased Gunby's offense level from 16 to 20, which raised the sentencing range from 21-27 months to 33-41 months. The district judge sentenced Gunby to forty-one months in prison, an increase of fourteen months, or fifty-two percent over the maximum sentence possible at the lower offense level. Given the nature of Gunby's conduct, we do not find this increase unreasonable.

Gunby was convicted of two serious offenses stemming from an

---

assumption. Second, *Sarault* itself went on to dismiss this argument with regard to a RICO conviction: the First Circuit concluded that the significant disruption of a governmental function "is by no means "inherent in the offense' of racketeering." 975 F.2d at 20. Similarly, we conclude that the significant disruption of a governmental function is by no means inherent in the offense of fraud.

extended pattern of reprehensible behavior.  He defrauded the taxpayers of approximately $403,217 over a five-year period—roughly $10 per person in the entire county.  He understated his income by forty-three percent over the same five-year period.  A fourteen-month increase in Gunby's sentence may deter other judges, especially those with supervisory authority, from ignoring the laws applicable to their courts and turning their offices into money-changing enterprises in this manner.  The public has a right to expect closer adherence to the law from judges, and when judges fall from grace they should expect to land a little harder than the rest.  A fifty-two percent increase in the sentence of a chief magistrate who embezzles and secretes the filing fees of ordinary litigants for five years will not encourage unwarranted sentencing disparities.  We find Gunby's sentence to be proportionate to the gravity of his offense.

B.

Gunby also attacks the factual predicate for the court's sentence, arguing that there was insufficient evidence to warrant an upward departure.  Gunby contends that there was no evidence that his embezzlement impeded the operation of the Magistrate Court of Baldwin County:  "There was no evidence that a single litigant or a single case out of the thousands that went through this court during the years in question was ever affected in its handling in any way."  In other words, Gunby argues that the word "disruption" in section 5K2.7 cannot mean diminished respect for the legal system and the judiciary.  He asks us to limit the term "disruption" to a work stoppage or a decline in the operating

efficiency of the Government.

We review the district court's interpretation of the word "disruption" in section 5K2.7 for an abuse of discretion. [13] *See Koon,* --- U.S. at ---- - ----, 116 S.Ct. at 2047-48. The most basic function of a court system is to promote the rule of law. Courts promote the rule of law by earning the respect of the people as the fair and dispassionate arbiters of society's disputes, both large and small. A court system cannot operate effectively without the respect of the people. If the people do not respect the judiciary, the people will disobey its edicts and flout its commands. The people will resort to self-help. Court personnel who cause people to question the integrity and impartiality of the judiciary therefore undermine the rule of law and disrupt the functioning of the courts. If Gunby's fraudulent schemes caused the people of Baldwin County to doubt the impartiality of the magistrate court, then Gunby has significantly disrupted a governmental function. The district court did not abuse its discretion in concluding that guideline section 5K2.7 encompasses this loss of confidence in government. *See United States v. Khan,* 53 F.3d 507, 518 (2nd Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996); *United States v. Murillo,* 902 F.2d 1169, 1174 (5th Cir.1990).

---

[13]This is a legal question. The *Koon* Court has instructed the courts of appeal to apply the "abuse of discretion" standard to a district court's determination of legal questions even though we "need not defer to the district court's resolution of the point." *Koon,* --- U.S. at ----, 116 S.Ct. at 2047. Therefore, we review the district court's determination of this legal issue *de novo* in order to determine whether it has abused its discretion. *See id.* at ---- - ----, 116 S.Ct. at 2047-48.

The district court found that Gunby's crimes in fact caused a loss of faith in the courts of Baldwin County.  We must affirm the district court's determination of the facts supporting an upward departure unless that determination was clearly erroneous. *See United States v. Christopher,* 923 F.2d 1545, 1555 (11th Cir.1991).  It was not clearly erroneous for the district court to infer that revelations of embezzlement and tax evasion by the Chief Magistrate of Baldwin County shook the confidence of county residents in the integrity of the court system.[14]

AFFIRMED.

---

[14]Gunby also contends that for a sentencing court to depart upwards on the basis of no evidence violates his right to due process under the Fifth Amendment to the United States Constitution.  We do not reach this issue because we conclude that the district court departed on the basis of a permissible inference, i.e., that Gunby's convictions cast doubt upon the integrity of the Baldwin County judiciary.