PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

--------------
Nos. 98-4023, 98-4024
--------------
D. C. Docket Nos. 96-341-CR-JAL
97-102-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SALVADOR MAGLUTA,

Defendant-Appellant.

-----------------------------------------------
Appeals from the United States District Court
for the Southern District of Florida
-----------------------------------------------
**(December 23, 1999)**

Before BIRCH and CARNES, Circuit Judges, and MILLS\*, Senior District Judge.

RICHARD MILLS, Senior District Judge:

Magluta appeals from his conviction and sentence imposed in two separate

cases: the "false identification case" and the "bond jumping case."

---

\*Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

Mainly, he seeks review of the district court's denial of his motion to suppress evidence and the sentences he received.

We affirm in part, vacate in part, and remand for re-sentencing.

## I. BACKGROUND

A.    False identification case

Before his incarceration, Magluta was a wanted man. At the time of his arrest on October 15, 1991, Magluta had four outstanding arrest warrants from several jurisdictions: one from the State of Florida for 1979 cocaine trafficking charges; one from the State of California for 1985 drug trafficking charges; one from the Middle District of Florida for a currency structuring conspiracy charge; and one from the Southern District of Florida for various narcotic offenses.

Based on the four outstanding warrants, the United States Marshal's Service Fugitive Unit conducted a search for Magluta and eventually located him through a confidential informant. The law enforcement officials determined that Magluta was at a house located at 98 East LaGorce Circle in Miami Beach, Florida ("LaGorce residence") and that he had rented the premises since August 1, 1987 using the name "Santiago Menendez." On October 15, 1991, at about 6:30 p.m., several federal and state law enforcement officials arrested Magluta in the bushes of a neighbor's house. Law enforcement officials also arrested another suspect in the LaGorce residence, and

conducted a security sweep of the residence.

That evening, Special Agent David Borah of the Drug Enforcement Administration ("DEA") swore to an affidavit and obtained a search warrant for the LaGorce residence. The warrant affidavit contained Agent Borah's sworn statement that: 1) several witnesses, including a neighbor, verified that Magluta lived at the LaGorce residence; 2) that during a security sweep of the premises, law enforcement officers observed "black gym bags inside the closet that were covered up by blankets;" 3) that the officers also observed a safe, numerous papers, and a "large amount of cash" in plain view of a bedroom closet in the guest house;[1] 4) that Borah had been investigating Magluta since 1986, and that as a result of his investigations, Magluta was indicted in 1991 for violating federal drug laws; 5) that Agent Borah has received information from confidential informants regarding Magluta's drug and money laundering activities since 1986.

The magistrate judge found that there was probable cause to believe that Magluta was involved in drug trafficking activities, and approved the search warrant.[2] As a result of the search, agents seized various documents, $349,000 worth of jewelry,

---

[1] Agent Borah swore that based upon his experience as a member of the DEA, such items were commonly possessed by drug traffickers.

[2] After a separate trial on the drug charges, a jury acquitted Magluta.

six cellular phones, two fax machines, a money counter, $126,002 in cash, and newspaper articles and documents relating to pending court proceedings against Magluta. Agents also seized various identification documents with Magluta's picture, but with different names. The documents seized were as follows: Florida driver's licenses in the names of "Samuel Martinez," "Luis Alberto Chang," "Angelo Rosario," and "Christian David Galeano;" New Jersey driver's licenses in the names of "Manuel Martinez" and "Christian D. Galiano;" a California driver's license in the name of "Michael Santini;" a United States passport in the name of "Samuel Martinez;" a Venezuelan passport in the name of "Manuel Martinez;" a Panamanian passport in the name of "Luis Alberto Chang Acosta;" two counterfeit INS forms I-94 in the names of "Manuel A. Martinez" and "Luis Alberto Chang Acosta;" and Social Security cards and Dade County voter registration cards in the names of "Samuel Martinez," "Christian David Galeano," and "Michael Santini." Agents also seized bank records for four foreign bank accounts opened with various aliases, documents relating to Magluta's rental of various properties, and other receipts.[3]

On August 2, 1996, a grand jury returned a ten count indictment against

---

[3] The receipts were for money spent at Nevada casinos between 1985 through 1991 which totaled approximately $200,000.00, a stay at New York's St. Regis hotel in October 1991 which totaled $7,000.00, and a ski trip to Aspen, Colorado in November 1989 which totaled $9,400.00.

Salvador Magluta:

Count I charged Magluta with making a false statement in an application for a passport, in violation of 18 U.S.C. § 1542 and § 2;

Count II charged that Magluta intentionally procured and obtained documentary evidence of U.S. naturalization and citizenship in violation of 18 U.S.C. § 1425(b);

Count III charged that Magluta unlawfully possessed a Venezuelan passport purportedly issued to "Manuel A. Perez," which contained a photograph of Magluta, in violation of 18 U.S.C. § 1546;

Count IV charged that he unlawfully possessed a Panamanian passport with the name "Luis Alberto Chang," which contained a photograph of Magluta, in violation of 18 U.S.C. § 1546;

Count V charged that he obtained a Florida Driver's license through the use of his "Luis Alberto Chang" passport in violation of 18 U.S.C. § 1544;

Counts VI and VII charged him with possession with intent to use unlawfully five or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3);

Counts VIII, IX, and X charged Magluta with furnishing false information on an application for a Social Security card, in violation of 42 U.S.C. § 408(a)(6).

A jury convicted Magluta on all ten counts.

B.    Bond jumping case

5

On February 6, 1997, during the course of his false identifications trial, Magluta left the courthouse and asked the court security officer to tell Magluta's attorney that he had left to get something from the car. Magluta, however, did not return for the remainder of the trial.

Over two months later, federal marshals arrested Magluta in West Palm Beach, Florida.[4] Magluta eventually pleaded guilty to failure to appear before the district court during his trial -- a violation of 18 U.S.C. § 3146.

C. Sentencing hearing

The district court held a combined six-day sentencing hearing for both cases. In the false identification case, the parties agreed that the ten counts should be grouped together pursuant to U.S.S.G. § 3D1.2(b) (1990). Out of the three possible sections that the district court could have applied under § 3D1.3 in determining the base offense level, the district court applied §2F1.1 (provision for fraud or deceit) to the

---

[4] At the time of his arrest, Magluta was driving a car that was rented to "Carlos Guerra." Moreover, he had changed his appearance by shaving his head and wearing a wig. He possessed a bag containing $20,000.00 in cash, several identification documents in the name of "Juan Alfonso," and a notepad containing various notes, including, but not limited to: instructions to his son regarding grand jury testimony; a list of "[p]eople I need to have access with;" a note stating "[r]edo-do = all corporations & redistribute all shares;" and a note stating, "FORFEITURES: Everybody put claimers on all the objects etc." In addition, it was later determined that he had been living in a suite at the Ritz-Carlton hotel under the name of "Edward Cedras."

counts and assigned a base offense level of six. The district court also imposed a two-level increase for "violation of judicial . . . process" under §2F1.1(b)(3)(B) because Magluta used false identification documents to avoid judicial process, and increased the base offense level to 12 under §2F1.1(b)(5) for using a foreign bank account in the offense. The district court found that, based on a base offense level of 12 and a criminal history category of III, the relevant imprisonment range was 15 to 21 months.

The district court, however, imposed a six-level upper departure pursuant to U.S.S.G. § 5K2.7, Application Note 9 to § 2F1.1 and § 5K2.9, for disrupting governmental function, committing the offense to facilitate the commission of another offense, and causing loss of confidence in an important institution, respectively. The court also granted the government's request for an upper departure of Magluta's criminal history category from III to VI, pursuant to § 4A1.3. As a result, the adjustments yielded a sentencing range of 57-71 months, and the court sentenced Magluta to 71 months imprisonment.

In the bond jumping case, the district court applied U.S.S.G. § 2J1.6(a)(2) (1997) and set the base offense level at six. Holding that "the underlying offense" carried a possible term of imprisonment for over 15 years, the court then increased the offense level by nine pursuant to § 2J1.6(b)(2)(A). The court then added two-levels for obstruction of justice under § 3C1.1 based on the documents Magluta possessed

7

at the time of his arrest regarding his assets and corporate entities as well as the fraudulent identifications he possessed and used while he was a fugitive. The court then gave a three-level reduction for acceptance of responsibility under § 3E1.1. With regard to Magluta's criminal history category, the court departed upward to criminal history category of V based on the risk of recidivism. Accordingly, based on a base offense level of 14 and a criminal history category of V, the court found the relevant sentencing range to be 33-41 months. The court sentenced Magluta to 41 months.

In both cases, the district court sentenced Magluta to three years supervised release, and that the respective sentences and supervised release were to be served consecutively.


## II. ISSUES

The issues raised in this appeal are whether:

1. Magluta's conviction in the <u>false identification</u> case should be reversed because the search warrant affidavit that justified the search of Magluta's LaGorce residence was facially insufficient to support a finding of probable cause;

2. In the <u>false identification</u> case, whether the district court erred in applying the fraud provision (§ 2F1.1) as opposed to the guideline for false citizenship and naturalization documents (§ 2L1.1);

8

3.    In the <u>false identification</u> case, whether the district court erroneously imposed the enhancements for use of a foreign bank account and for a violation of "judicial process;"

4.    In the <u>false identification</u> case, whether the district court erred in increasing Magluta's criminal history category by three levels;

5.    In the <u>bond jumping</u> case, whether the district court correctly applied the Sentencing Guidelines to impose a sentence that is consecutive to the sentence in the <u>false identification</u> case;

6.    In both cases, whether the district court erroneously ordered the terms of supervised release to run consecutively.

## III. STANDARD OF REVIEW

Whether a search warrant affidavit provides sufficient facts to establish probable cause is reviewed *de novo*. See <u>United States v. Butler</u>, 102 F.3d 1191, 1198 (11th Cir.), <u>cert. denied</u>, 117 S.Ct. 1712 (1997).

We review the district court's interpretation of the sentencing guidelines *de novo*. See <u>United States v. Maurice</u>, 69 F.3d 1553, 1556 (11th Cir.1995). The sentencing court's factual determinations are reviewed for clear error. See <u>United States v. Taylor,</u> 88 F.3d 938, 942 (11th Cir. 1996); <u>United States v. Howard</u>, 923 F.2d 1500, 1503 (11th Cir. 1991). Lastly, the district court's decision to depart from the

applicable sentencing guideline range is reviewed for abuse of discretion.  See Koon

v. United States, 518 U.S. 81, 97, 116 S. Ct. 2035, 2046 (1996); United States v.

Hoffer, 129 F.3d 1196, 1199 (11th Cir. 1997).

## IV. DISCUSSION

A.    Search Warrant

Magluta contends that Agent Borah's affidavit failed to establish probable cause

to search the LaGorce residence.  We must reject Magluta's argument.

The task of the issuing magistrate judge [in determining whether to issue a

warrant] is simply to make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him, including the "veracity" and "basis

of knowledge" of persons supplying hearsay information, there is a fair probability

that contraband or evidence of a crime will be found in a particular place.  See Illinois

v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983).  This question is reviewed

de novo by an appellate court, "tak[ing] care to review findings of historical fact only

for clear error and to give due weight to inferences drawn from those facts by resident

judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690,

697, 116 S.Ct. 1657, 1662 (1996).  We note, however, that "[i]nformation [in the

warrant application] must be timely for probable cause to exist, for probable cause

must exist at the time the magistrate judge issues the search warrant." United States

v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994) (quoting United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994)).

Magluta first argues that the information relating to the 1991 indictment were "stale," and not indicative of an ongoing criminal enterprise because the affidavit failed to indicate "when Magluta was said to have been involved [in the drug transactions.]" We reject this argument for three reasons: first, the "basic criterion as to the duration of probable cause [or staleness] is the inherent nature of the crime." Bocaro, 742 F.2d at 1346. In this case, it is undisputed that Magluta was being investigated for drug trafficking activities -- which are activities this Court has previously noted to be "inherently protracted and continuous." See id. Thus, the specific dates that Magluta engaged in the illegal activity are not as important as the nature of the underlying offense in determining the staleness issue. Second, the affidavit also demonstrated that Magluta maintained an ongoing relationship with a coconspirator, Orlando Lorenzo. Such a relationship with a coconspirator is a strong indicator of a defendant's continuing criminal activity. See United States v. Harris, 20 F.3d 445, 451 (11th Cir. 1994) (noting that a coconspirator's access to the defendant's house made it "probable that drug-related activities took place or drug-related documents were stored at the house.") Third, even if we were to assume that the information related to the indictment is stale information, "such information

is not fatal where the government's affidavit updates, substantiates, or corroborates the stale material." United States v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994) (quoting United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994)). As noted before, the items observed by law enforcement officers during the security sweep are typical in a drug trafficker's home. As such, the observed items contemporized and corroborated the information that Magluta had been -- and was -- engaged in drug trafficking at the time the warrant was issued.

Magluta's "lack of nexus" argument must also fail. The affidavit points out that Magluta was living at the LaGorce residence, that he was a known drug trafficker, and that law enforcement officials saw items that are typically held by drug traffickers inside the LaGorce residence. Accordingly, we find that the affidavit shows a nexus between Magluta's drug trafficking activity and the LaGorce residence to support a search warrant for the residence.

In sum, we find that given the information relating to Magluta's past drug trafficking activity, corroborated by the recent information obtained during the security sweep, there was a fair probability that Magluta was involved in illegal activity, and that evidence of that activity would be found at the LaGorce residence. Accordingly, the search warrant was supported by probable cause and the evidence seized during the search -- e.g., fake passports, driver's licenses, identification cards

and Social Security cards -- were properly obtained and admitted during the course of the false identification trial.

Magluta's conviction is hereby affirmed.

B.    Sentence in the <u>false identification</u> case

1.    Whether the district court used the correct guideline

The district court adopted the recommendation in the PSI that § 2F1.1[5] governed the guidelines for Counts VI-X, which charged violations of 18 U.S.C. § 1028, and 42 U.S.C. § 408.  Magluta argues that the district court should have looked at the specific conduct underlying the conviction and should have applied § 2L2.2, the Guideline for "Fraudulently Acquiring Evidence of Citizenship or Documents Authorizing Entry for Own Use."  The question about whether a particular guideline applies to a given set of facts is a question of law, <u>see</u> <u>United States v. Scroggins</u>, 880 F.2d 1204, 1206 n. 5 (11th Cir. 1989), and thus, we review the district court's decision *de novo*.

Magluta analogizes this case with <u>United States v. Kuku,</u> 129 F.3d 1435 (11th Cir. 1997), where this Court vacated a sentence of a defendant who was convicted of

---

[5]    Although the sentencing occurred in 1997, the district court used the 1990 version of the Sentencing Guideline to calculate Magluta's base offense level in the false identifications case, presumably because the 1990 version is more favorable to Magluta than the 1997 version.

unlawfully producing Social Security cards and selling them to illegal aliens. In that case, the district court sentenced the defendant under § 2F1.1 without examining the underlying offense conduct to determine whether § 2F1.1 actually envisioned defendant's offense conduct. See Kuku, 129 F.3d at 1438. On appeal, this Court held that the facts in that case, along with the language used in the Guidelines, made § 2L2.1 more applicable. Similarly, Magluta argues that the district court failed to examine the underlying conduct and erroneously used § 2F1.1, when the facts of this case and the language used in the Guidelines makes § 2L2.2 more appropriate.

We reject this argument.

First, under the statutory index of the 1990 Guidelines, § 2F1.1 is the only referenced provision for violations of 42 U.S.C. § 408. Moreover, 2F1.1 is available as a relevant provision to 18 U.S.C. § 1028 violations, while § 2L2.2 is not listed as one of the available provisions. See U.S.S.G. App. A (1990).[6] Based on this index, the district court correctly applied § 2F1.1.

_____

[6]Although the statutory index may not be conclusive as to the propriety of a certain Guideline, see, e.g., United States v. Velez, 113 F.3d 1035, 1037 (9th Cir. 1997), we find that it is an important starting point for determining the correct guideline.

Second, there is a critical difference between this case and Kuku.[7]  In Kuku, the case involved trafficking false identification documents for the purpose of violating, or assisting others to violate, the laws relating to naturalization, citizenship, or legal resident status, which made § 2L2.1 a natural fit.  In this case, the record is devoid of any evidence that suggests Magluta possessed the false documents to violate laws relating to naturalization, citizenship, or resident status.  Magluta did not use the false identifications to portray that he was an American citizen; Magluta was already a naturalized citizen.  Instead, the record reflects that Magluta provided false information to various government agencies to fraudulently obtain false identifications to use in evading law enforcement officials.  Thus, when we look at the "conduct which formed the basis of the underlying conviction" as Magluta suggests, we find that § 2F1.1 (fraud and deceit) better suits the facts of this case.  See also U.S.S.G. § 2F1.1 comment. (n.11) (1990) ("Offenses involving fraudulent identification

---

[7]In Kuku, this Court relied in part on the language in Commentary 11 of § 2F1.1, which reads in pertinent part:

> Where the primary purpose of the offense involved the unlawful production, transfer, possession, or use of *identification documents for the purpose of violating, or assisting another to violate, the laws relating to naturalization, citizenship, or legal resident status*, apply §2L2.1 or § 2L2.2, as appropriate, rather than §2F1.1.

U.S.S.G. § 2F1.1 comment. (n.11), as amended by U.S.S.G. App. C, Amendment 483. [Emphasis added].

documents . . . in violation of 18 U.S.C. §§ 1028 and 1029, are also covered by this guideline.")

Accordingly, we find no error in the district court's decision to apply § 2F1.1.

2.      Enhancement for use of a foreign bank account under § 2F1.1(b)(5)

The district court enhanced Magluta's base offense level under § 2F1.1(b)(5) because Magluta had a Bahamian bank account in the name of Manuel A. Martinez. Section 2F1.1(b)(5) allows an enhancement if "the offense involved the use of foreign bank accounts or transactions to conceal the true nature or extent of the fraudulent conduct." The court found that § 2F1.1(b)(5) was an appropriate adjustment "based on both the nature and extent of the concealment and of the fraud concerning the concealment of funds and the concealment of the person that were intertwined through the use of a foreign bank account."

Magluta argues that this adjustment was improper because Magluta's offense -- possession or procurement of false identifications -- did not "involve a use of a foreign bank account" as used in § 2F1.1(b)(5), and that even if a foreign bank account was used, the enhancement was still improper because the account was not used to "conceal the true nature or extent of the fraudulent conduct." In contrast, the government argues that since the "driving force" of Magluta's offense was his concealment of himself from law enforcement officials, he used funds from his

16

foreign bank account to sustain his fugitive status, and thus, the enhancement was proper. Since this issue presents a mixed question of law and fact, we review the district court's decision *de novo*. See United States v. Arguedas, 86 F.3d 1054, 1057 (11th Cir. 1996).

There are no reported court of appeals cases that address the imposition of a § 2F1.1(b)(5) enhancement. The plain language of this subsection, however, suggests that there are two basic elements to this enhancement: first, the offense must involve the use of the foreign bank account; and second, the use must be to "conceal the true nature or extent of the fraudulent conduct." The Commission appears to have included this subsection because:

> [o]ffenses that involve the use of transactions or accounts outside the United States in an effort to conceal illicit profits and criminal conduct involve a particularly high level of sophistication and complexity. These offenses are difficult to detect and require costly investigations and prosecutions. Diplomatic processes often must be used to secure testimony and evidence beyond the jurisdiction of United States courts.

U.S.S.G. § 2F1.1, comment. (backg'd). Thus, the provision was designed to punish and deter defendants from using foreign accounts to conceal illicit profits and criminal conduct, because the use of foreign bank accounts often resulted in additional difficulties imposed on the government in investigating the defendant. Consequently, we hold that for an offense to "involve the use of a foreign bank account," the foreign bank account was used to further the underlying offenses, or somehow was used to

17

hinder the investigation and/or the prosecution of the underlying offenses.

In this case, the district court focused on Magluta's relevant conduct, and not solely on the possession of false identifications to support the enhancement under this section. Therefore, as an initial matter, we must determine whether the "offense" as used under this subsection encompasses Magluta's relevant conduct of avoiding capture. The government argues that the driving force behind Magluta's conduct was the concealment of himself from law enforcement authorities. Since Magluta was able to conceal himself and his assets through the use of the money in the foreign bank account, the enhancement was justified.

We agree.

Although Magluta was convicted for possessing and procuring false identifications documents, his "offense" for sentencing purposes includes all other relevant conduct that relates to the conviction.[8] In this case, Magluta's relevant conduct consisted of using those false identifications to avoid arrest and to impede prosecution of the false identification charge, and other charges. Thus, his "offense" includes his conduct to avoid capture and prosecution.

The record reflects that Magluta had a foreign bank account in the name of one

_____

[8] Relevant conduct includes, "all acts . . .in the course of attempting to avoid detection or responsibility" for the underlying offense. U.S.S.G. § 1B1.3 (a)(1) (1990).

18

of his aliases, and that during the time he was concealing himself from law enforcement officials, he made several withdrawals from that account. Due to the large amount of money that Magluta possessed in his foreign bank account, he was able to use the money to conceal himself from the authorities. Moreover, unlike in cases where the law enforcement officials can capture fugitives by tracking the fugitive's domestic bank transactions, the facts of this case show that because Magluta's fiscal resources were located in a foreign bank, law enforcement officials had additional difficulty tracking Magluta.[9] Further, it is reasonable to infer that Magluta's financial resources gave him the ability to hide in places where law enforcement officials would not normally look for a fugitive, e.g., expensive hotels, and also that the financial resources gave Magluta greater geographic mobility. Therefore, we hold that Magluta's "offense" involved the use of a foreign bank account and that such use hindered the investigations into the offense.

Magluta further argues that even if the foreign bank account was used, the enhancement was still improper because it was not used to "conceal the true nature or extent of the fraudulent conduct." We disagree. As noted before, the district court correctly found that the true nature of Magluta's fraudulent conduct involved the use

_____

[9] As such, we necessarily reject Magluta's contention that § 2F1.1(b)(5) was designed solely to punish "financial" fraud.

19

of false identifications to avoid prosecutions in several jurisdictions. Since we held

that the district court correctly found that Magluta used the money in the foreign bank

account to sustain his fraudulent conduct of hiding himself from law enforcement

officials, we necessarily conclude that the second element is also satisfied.

Accordingly, we hold that the § 2F1.1(b)(5) enhancement was proper.[10]


3.      Upward departures

In addition to the abovementioned enhancements, the district court made a six-

level upward departure based on § 5K2.7, § 2F1.1, Application Note 9, and § 5K2.9.

Magluta argues that the departure was erroneous because the reasons given for the

departures were already used in imposing the enhancements. We review a district

court's decision to depart from the Guidelines for an abuse of discretion. See Koon,

518 U.S. at 100, 116 S.Ct. 2035. In reviewing departures from the Guidelines, this

Court has developed a three-part test:

> (1) Was the aggravating circumstance cited by the district court
> adequately taken into consideration by the Sentencing Commission in
> formulating the Guidelines?

---

[10] Section 2F1.1(b)(5) requires the base offense level to be raised to 12 if the base offense level is less than 12. See U.S.S.G. § 2F1.1(b)(5). Since we affirmed the enhancement under this section, Magluta's challenge to the § 2F1.1(b)(3)(B) enhancement is moot because that enhancement would have no effect on Magluta's base offense level.

20

(2) If adequate consideration was not given to the circumstance, was consideration of the circumstance consistent with the goals of the Sentencing Guidelines?

(3) If the circumstance was properly taken into account, was the extent of the departure from the guideline range reasonable?

United States v. Gunby, 112 F.3d 1493, 1499 (11th Cir. 1997). The first prong of the test is not present in this appeal. Moreover, since the departure grounds used were based on factors suggested by the Commission, we need not discuss the second prong of the test. We address whether the facts in this case adequately fall under the factors listed to support the departure, and if they do, whether the amount of the departure is reasonable.

> a. Section 5K2.7

If the "defendant's conduct resulted in a significant disruption of a governmental function," § 5K2.7 allows the district court to depart from the Guidelines. The district court based the departure on the following three reasons: first, Magluta's use of false identifications led to the disruption of the orderly process of the court; second, at the time of the arrest, there were four outstanding warrants for him which disrupted the administration of justice; and third, that the U.S. Marshals Service expended a tremendous amount of resources to apprehend him.

Magluta argues that with the exception to the latter, the district court's stated reasons are repetitive of the reasons given for the § 2F1.1(b)(3)(B) enhancement.

21

Moreover, he argues that his conduct did not "disrupt governmental function" as defined under § 5K2.7. With respect to his first argument relating to double-counting, Magluta's argument is mooted by our decision today. Since § 2F1.1(b)(3)(B) (and the reasons given therefore) enhancement has no effect on the base offense level, we hold that even if the reasons given for the § 2F1.1 enhancement were used again to support the upward departure, that double counting is, at best, harmless error. That being said, we first direct our attention to whether the reasons given by the district court can support the departure under § 5K2.7.

Magluta's main argument with respect to this provision is that there was no "disruption" of governmental function as defined by § 5K2.7 because the cases upholding the § 5K2.7 departure reveal two distinct fact patterns, in neither of which this case fell. Magluta identifies that the first group of cases involve defendants who were government employees whose crimes seriously compromised the ability of their governmental employer to perform its appointed functions. See, e.g., United States v. Gunby, 112 F.3d 1493, 1500-03 (11th Cir. 1997) (a magistrate embezzling filing fees); United States v. Baird, 109 F.3d 856, 871 (3d Cir. 1997) (corrupt police officer). The other group of cases involve offenses of the outside actor that significantly frustrate the normal day-to-day operations of government. See, e.g., United States v. Kramer, 943 F.2d 1543, 1550 (11th Cir. 1991) (a crashed helicopter on prison grounds

22

in an unsuccessful prison escape justified a § 5K2.7 departure); United States v. Kikumura, 918 F.2d 1084, 1117 (3d Cir. 1990) (disallowing a § 5K2.7 departure based on a defendant's intent to bomb federal buildings in order to influence policy). Magluta argues that since the facts of this case do not fall into either category, there was no "disruption" of a governmental function.

The government argues that Magluta's conduct disrupted the governmental function in two ways. First, Magluta imposed substantial costs upon the Marshal's Service which, beginning in January 1990, had provided assistance to other law enforcement agencies. Second, Magluta undermined the ability of courts and the criminal justice system to enforce its judgments and thereby societal order.

Initially, we reject Magluta's contention that the facts of this case must fall into one of the two patterns in order to support a "disruption of governmental function" departure. We find nothing in the case law or the Sentencing Guidelines that limits the application of § 5K2.7 to just the two fact patterns. Further, we disagree with the government's argument that Magluta's acts significantly disrupted the functions of the Marshal's Service because one of the functions of the Marshal's Service is to track fugitives. See 28 U.S.C. § 566(e)(1)(B). The record does not show that the Marshal's Service was significantly disrupted by Magluta's use of the false identification documents. The Marshals were merely carrying out their normal duties of tracking

23

fugitives.

With respect to the government's second argument that Magluta undermined the ability of various courts to enforce its judgments, we hold that the district court's finding was proper. As we noted in United States v. Gunby, 112 F.3d 1493, 1502 (11th Cir. 1997), the most basic function of the court system is to promote the rule of law, which cannot function properly if the people lose respect for, and confidence in, the judiciary. We conclude that it was reasonable for the district court to find Magluta's continuous disregard for the rule of law, as evidenced by the number of outstanding warrants, coupled with his extravagant lifestyle while a fugitive, caused people to lose confidence in the effectiveness of the judicial system and, in turn, disrupted the orderly process of the administration of justice. Therefore, we hold that the district court did not abuse its discretion in upward departing Magluta's base offense level.

b.      Application Note 9 of § 2F1.1

As another basis for the upward departure, the district court relied on Application Note 9 of § 2F1.1, which reads: "[d]ollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted." Specifically, the district court found that subsection (e) applied to Magluta's offense, which allows a departure if a defendant's conduct

caused a "loss of confidence in an important institution." The "institution" that the district court referred to was the judicial system.

The record shows that the district court relied on the same conduct that supported the application of § 5K2.7 to apply Application Note 9. Mainly, to support both grounds for upward departures, the district court found that the "loss of confidence" in the court system resulted in a "disruption of a governmental function." In essence, we find that the reasons given by the district court to support the departures were extremely similar, and thus, we conclude that the district court abused its discretion in relying on the same conduct to upward depart under § 5K2.7 and Application Note 9.

c. Section 5K2.9

The district court also found that § 5K2.9 applied, which permits a departure if the "defendant committed the offense in order to facilitate or conceal the commission of another offense." The district court stated, "based upon the facts and circumstances of this case, there are indications of tax evasion, possession of a firearm by a convicted felon and of course bond jumping." Magluta argues that since the district court did not find by a preponderance that he had committed the offense of tax evasion and felon-in-possession of a firearm, but that there were "indications" of such conduct. Consequently, he argues, that finding is inadequate to support the departure.

25

Alternatively, Magluta argues that even if there was sufficient evidence to support a finding that Magluta committed the offenses of tax evasion and felon-in-possession, the district court erred because it made no finding that he acquired and possessed false identification documents *in order to* commit those offenses. We reject both of these arguments.

We find that the record sufficiently shows that Magluta acquired and possessed the false documents in order to commit the offense of tax evasion, and felon-in-possession. The record reflects that Magluta did not have a steady source of legitimate income, yet he possessed money in excess of $1.2 million, and lived an extravagant life. In addition, he held some of these assets in a bank account opened through the use of a false identification. Under these facts, it is reasonable to infer and find by a preponderance that Magluta acquired false identifications to facilitate his hiding of assets from the government – mainly, the Internal Revenue Service. Moreover, with regard to the felon-in-possession charge, Magluta used one of his aliases, Angelo Maretto, to purchase a firearm. This is strong circumstantial evidence that Magluta obtained the false identification to illegally purchase the firearm, because he knew he could not purchase a firearm in his own name. Based on these pieces of evidence, we conclude that the district court correctly found that Magluta committed the offense to facilitate the crime of tax evasion and felon-in-possession of a firearm,

and that he possessed the false identifications to facilitate the commission of those crimes. Accordingly, we find no abuse of discretion in the district court's reliance of § 5K2.9 as a departure ground.

In sum, we find that the reasons given by the district court in support of the departure satisfies the first two prongs of the Gunby test. Magluta's base offense level does not adequately take into consideration the aggravating circumstances stated by the district court. Per the third prong of the test -- whether the extent of the departure is reasonable -- we must remand. Since we found that one of the grounds relied on by the district court constituted double counting, we must remand for a determination by the district court of whether a six-level departure can be reasonably supported by just the two factors in § 5K2.7 and § 5K2.9.

4. Criminal history category departure in the false identification case

The district court raised Magluta's criminal history category from III to VI in the false identifications case. Magluta argues that the court erred in departing because it relied on impermissible grounds. We review the district court's decision to depart for abuse of discretion. See Koon, 518 U.S. at 97, 116 S.Ct. at 2046 (1996); United States v. Hoffer, 129 F.3d 1196, 1199 (11th Cir. 1997).

Section 4A1.3 allows the sentencing court to upward depart on the criminal history category "[i]f reliable information indicates that the criminal history category

27

does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." In addition, § 4A1.3 provides some non-exhaustive list of examples which demonstrate possible bases of departure, such as "whether defendant was pending trial or sentencing on another charge at the time of the instant offense." U.S.S.G. § 4A1.3(d).

The record reflects that the district court based the upper departure on three grounds: first, Magluta's fugitive status as a result of pending charges in California and Florida; second, the likelihood of recidivism "based upon the facts and circumstances of this case;" and third, the fact that Magluta used false identification after he absconded himself from the trial. The district court chose the criminal history category of VI because "it is the criminal history category which adequately reflects the defendant's conduct, taking into consideration the number of charges that were pending against him during the offense and the likelihood of recidivism."

Magluta argues that the reasons given by the district court cannot support departure in the false identifications case because they relate to acts that were contemporaneous with, if not part of, the underlying offense. See United States v. Ledesma, 979 F.2d 816, 821 (11th Cir. 1992) ("[T]he criminal history category depends on the defendant's conduct prior to, rather than contemporaneous with, the offense of conviction.") In other words, he argues that a § 4A1.3 departure can only

28

be based on conduct that occurred prior to the current offense.

Magluta also argues that since the district court already considered the previous pending charges as relevant conduct in calculating the base offense level, they were part of the offense in this case, and thus, they too could not be used as a basis of criminal history departure. See United States v. Adudu, 993 F.2d 821, 823 (11th Cir. 1993) ("if the criminal acts were 'part of . . . the same course of conduct or common scheme or plan as the offense of conviction,' then, as a matter of law, it was an impermissible ground upon which to base a criminal history departure.") (quoting United States v. Jones, 948 F.2d 731, 737 n.11 (D.C. Cir. 1991)). The government does not directly dispute Magluta's contentions, but rather argues that the district court did not abuse its discretion by departing because it also relied on Magluta's post-flight conduct of acquiring more false identification to determine the risk of recidivism. The government relies on United States v. Fayette, 895 F.2d 1375 (11th Cir. 1990) for the proposition that Magluta's acts of gathering more false identifications further supports the risk of recidivism, and in turn, supports the criminal history departure. We agree.

In Fayette, we held that § 4A1.3 was the appropriate mechanism, as opposed to an unguided § 5K2.0 departure, for factoring a defendant's post-plea offenses to the defendant's sentence. See Fayette, 895 F.2d at 1380. While reaching this conclusion,

29

we suggested that the timing of the offenses was insignificant with respect to a §

4A1.3 departure, and considered that such post-plea conduct under § 4A1.3 as a basis

for a departure was consistent with the "individual deterrence" objective of the

Guidelines.  See id.  Similarly, we reject Magluta's argument that only the conduct

that occurred prior to the offense can be considered for the purposes of § 4A1.3

departure; all conduct that occurred prior to sentencing, that was not already

considered as part of the offense of conviction, can be considered in determining the

risk of recidivism, and in turn, can support a criminal history category departure.[11]

In the case at bar, the district court relied, in part, on Magluta obtaining and

using more false identifications after he jumped bond to support the departure.  That

conduct was not part of the offense of conviction, nor was it considered as relevant

conduct in calculating the base offense level.  Since Magluta was convicted of

possessing and using false identification documents, his post-conviction, pre-sentence

procurement of more false identifications shows that there was a likelihood of

recidivism.  We find no error in the district court's finding in that respect.  However,

we do find that the other two grounds the district court stated – the pending cases

---

[11] Our holding today does not conflict with the Adudu case.  In Adudu we
merely held that conduct that is part of the offense cannot be a basis for a criminal
history departure.  See Adudu, 933 F.2d 821, 823.  Nothing in Adudu prevents the
district court from considering post-conviction, pre-sentencing conduct when
making a criminal history category departure.

30

against Magluta, and the risk of recidivism stemming therefrom – were already factored into the calculation of Magluta's base offense level through the relevant conduct provisions.  See supra.

Having so decided, we must remand the case for a determination regarding the propriety of the three-level departure.  On remand, the district court should make a determination as to how much departure is appropriate when considering only the conduct that was not part of the offense of conviction.

C.    Sentencing in the bond jumping case

1.    Whether the district court properly imposed consecutive sentences

After the consolidated sentencing hearing, the district court imposed a separate sentence for the bond jumping case to run consecutively to the false identification case.  In his reply brief, Magluta conclusively argues for the first time that under Application Note 3 of § 2J1.6,[12] the district court was required to treat his bond jump solely as a two-level upward adjustment for obstruction of justice in the false identification case, and not as a separate case for sentencing purposes.

This Court "consider[s] sentence objections raised for the first time on appeal under the plain error doctrine to avoid manifest injustice."  United States v. Hansley,

---

[12]The district court used the 1997 version of the Sentencing Guidelines to calculate Magluta's base offense level in the bond jumping case.

54 F.3d 709, 715 (11th Cir.1995) (quoting United States v. Newsome, 998 F.2d 1571, 1579 (11th Cir.1993)). For the Court to correct plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. See United States v. Vazquez, 53 F.3d 1216, 1221 (11th Cir.1995); see also United States v. Olano, 507 U.S. 725, 731-35, 113 S.Ct. 1770, 1776-77 (1993). In addition, the error must "seriously affect the fairness, integrity, or public reputation of a judicial proceeding." United States v. Humphrey, 164 F.3d 585, 588 n.3 (11th Cir. 1999) (citing Olano, 507 U.S. at 732.)

Application Note 3 of § 2J1.6 states in part: "[I]n the case of a conviction on both the underlying offense and the failure to appear, the failure to appear is treated under § 3C1.1 (obstructing or impeding the Administration of Justice) as an obstruction of the underlying offense; and the failure to account and the count(s) for the underlying offenses are grouped together under §3D1.2(c)." Based on this language, Magluta argues that the district court should have only imposed a § 3C1.1 enhancement to the false identification case for his bond jump instead of performing a separate calculation for the bond jumping case. In contrast, the government argues that Application Note 3 should not apply because it conflicts with the statutory language in the failure to appear statute, 18 U.S.C. § 3146(b), which mandates that, "[a] term of imprisonment imposed pursuant to this section shall be consecutive to the

32

sentence of imprisonment for any other offense."[13] The government argues that since the Guideline's grouping rule conflicts with the statutory language and cannot be reconciled with the statutory mandate of a consecutive sentence, the Sentencing Guideline should not be followed. See, e.g., United States v. Packer, 70 F.3d 357, 359 (5th Cir. 1995) ("The [G]uideline treatment of section 3146(b)(2) would defeat the statutory intent that a failure to appear offense be considered separate and distinct from the underlying offense, warranting a separate and distinct penalty.")

We agree with Magluta that the district court may have committed an error by not following the application note to § 2J1.6. However, there is no need for us to address whether the Guideline does conflict with the statutory language, because we cannot find that the district court committed an error that is "plain." As we have explained in Humphrey, a district court's error is not "plain" or "obvious" if there is no precedent directly resolving a issue. See Humphrey, 164 F.3d at 588. We find nothing in our case law that directly deals with the potential conflict between the Guidelines and the failure to appear statute. At the worst, we find that there is at least room for doubt as to whether the Guideline's sentencing approach conflicts with the statutory mandate of the statute. As such, we find that the district court's decision to

_____

   [13] In Stinson v. United States, 508 U.S. 36, 113 S.Ct. 1913 (1993), the Supreme Court held that the Guideline commentary is authoritative unless it conflicts with the Constitution or an applicable statute.

33

calculate separate base offense levels in both the false identification case and the bond jumping case, and to impose a consecutive sentence is not an error that is "plain." Thus, we reject Magluta's argument.

2.      Enhancement under § 2J1.6(b)(2)

Above argument notwithstanding, Magluta argues that the district court erroneously enhanced his base offense level by three levels. Under § 2J1.6, a defendant's adjusted base offense level is based on the statutory maximum sentence for "the underlying offense" on which he failed to appear. U.S.S.G. § 2J1.6 assigns a base level of six, and then directs that offense level be increased by six levels if the "underlying offense" is punishable by five or more, but less than 15 years, or by nine levels if the "underlying offense" is punishable by a term of 15 years or more. See U.S.S.G. § 2J1.6(b)(2) (1997).

The district court enhanced Magluta's offense level by nine levels under § 2J1.6(b)(2)(A), concluding that "the underlying offense" on which Magluta jumped bond carried a statutory maximum sentence of 50 years, the aggregate of the five year statutory maximum on each of the ten counts of the indictment. Magluta argues that the district court should have interpreted the terms "underlying offense" to only include the most serious of the ten counts, and use it to calculate the appropriate amount of enhancement. In other words, under Magluta's interpretation of the

34

"underlying offense," the maximum sentence that should be used to calculate the enhancement should be five years.

In support of his position, Magluta relies on United States v. Iddeen, 854 F.2d 52 (5th Cir. 1988). In Iddeen, a pre-guidelines case, Iddeen was convicted of ten counts of mail fraud, which carried a five year maximum on each count, and was released on bond pending sentencing. See id. at 53. Iddeen jumped bond, but was later captured and convicted for failure to appear in violation of 18 U.S.C. § 3146. In formulating a sentence under the failure to appear statute, the district court aggregated maximum sentences in the ten counts of mail fraud and sentenced Iddeen to ten years of imprisonment under § 3146(b)(1)(A), which was to run consecutive to the forty years he received for the mail fraud convictions. See id. The Fifth Circuit remanded, holding that the terms "an offense punishable by" used in § 3146[14] means the maximum punishment of one offense, out of all the counts in the indictment, and not

---

[14]18 U.S.C. § 3146 proscribes punishment for violations as follows:
(b) Punishment.–(1) The punishment for an offense under this section is--
    (A) if the person was released in connection with a charge of, or while awaiting sentence, . . .
        (i) an offense punishable by death, life imprisonment, or imprisonment for a term of 15 years or more, a fine under this title or imprisonment for not more than ten years, or both;
        (ii) an offense punishable by imprisonment for a term of five years or more, a fine under this title or imprisonment for not more than five years, or both[.]
18 U.S.C. § 3146.

the aggregate of all offenses charged.  See id.  at 56.

The government first argues that the district court correctly interpreted the terms "the underlying offense" to encompass the aggregation of all the counts in the complaint because aggregating the sentences best fulfills the objective of providing greater deterrence to defendants who are facing longer prison terms, as opposed to a defendant who only faces a light sentence.  Second, the government argues that under the plain language, the phrase "the underlying offense" within § 2J1.6(a) reflects the Commission's intent to reach the full scope of penalties that a bond jumping defendant seeks to escape.  Under its view, the government suggests that the use of the definite article "the" to modify "underlying offense" distinguishes § 2J1.6 from the statutory language relied on by the Iddeen court, and that in light of vast number of federal indictments being multi-count indictments, "§ 2J1.6(b)(2) necessarily considers the multiple counts of an indictment as part of the same 'underlying offense.'"  We disagree with the government.

First, we believe that the operative word to focus on is the word "offense," as opposed to "offenses," and not on the articles "the" or "an."  With the proper focus, we find no ambiguity in the words "the underlying offense."  The terms describe one offense, and nothing more.  If we were to adopt the government's argument, we would be giving a plural meaning to the otherwise plain, singular meaning of the word

36

"offense." We find nothing in the Guidelines or the case law which suggests that Commission really meant the plural when it used the singular term "offense."

If the Commission wanted "the underlying offense" to mean the aggregate of all the counts, it could have removed all doubt by using the plural form of the word offense, "offenses." This logic is even more probative of the Commission's intent when viewed in the fact that the Commission should have been aware of the holding in Iddeen-- a pre-guideline case -- when it promulgated subsequent revisions to the Guidelines.

Thus, we carry over the reasoning in Iddeen to the Guidelines, and hold that the terms "the underlying offense" refers to the one count in the indictment--the most serious of the counts referred to in the indictment--and not the aggregate of all the maximum penalties in the counts under § 2J1.6. Accordingly, we hold that the district court erred in enhancing Magluta's base offense level in the bond jumping case by nine levels.

3.    Obstruction enhancement under § 3C1.1

The district court imposed a two level obstruction of justice enhancement to Magluta's base offense level under § 3C1.1, reasoning that the enhancement was "appropriate under the facts and circumstances of this case based on the documents that were found on the defendant at the time of his arrest and the additional fraudulent

37

identifications and the use of those identifications . . . ." Section 3C1.1 provides for a two level increase in the offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1 (1997). However, for failure to appear offenses and other offenses covered under § 2J1.6, the Commission instructs that the obstruction enhancement "does not apply, unless the defendant obstructed the investigation or trial of the failure to appear count." U.S.S.G. § 2J1.6 comment. (n.2). We review the district court's factual findings of obstruction of justice for clear error, and its legal conclusions *de novo*. See United States v. Arguedas, 86 F.3d 1054, 1059 (11th Cir. 1996).

Magluta argues that the enhancement was improper because the reasons on which the district court relied to support the enhancement were already taken into consideration in formulating the applicable guideline, and that he did not obstruct the investigation or trial of his bond jump. With regard to his first argument, Magluta relies on United States v. Sarna, 28 F. 3d 657 (7th Cir. 1994). In Sarna, the Seventh Circuit, in the context of a guideline departure, opined that fleeing the jurisdiction, traveling, working under assumed names, and evading law enforcement officials were types of conduct that "commonly inhere in the offense of failure to appear," and thus, such conduct could not be a basis for a departure from the Guidelines. Sarna, 28 F.3d

38

at 662. Similarly, Magluta argues that his post-flight conduct-- hiding from law enforcement authorities by using false identification--was already factored into his base offense level because such conduct is inherent in the crime of failure to appear. We reject this argument.

Magluta oversimplifies his post-flight conduct. Even if we were to agree with the Sarna court and hold that certain typical post-flight conduct is inherent in the crime of failure to appear, we cannot say that Magluta's conduct falls within that category.[15] Unlike the defendant in Sarna, Magluta was not merely working under assumed names or avoiding law enforcement officials by his own conduct. As noted before, the district court based the enhancement on the documents found on Magluta at the time of his arrest. These documents evidenced Magluta directing his family and friends to assist him in remaining at large by assessing a large amount of cash, erasing his asset trail, and instructing his son regarding the son's grand jury testimony.

Based on these pieces of evidence, the district court could have easily found that Magluta obstructed justice when law enforcement officials were attempting to apprehend Magluta. We do not find that Magluta's conduct of enlisting his friends and family members to help him remain a fugitive is the type of conduct that is

---

[15]We express no opinion with regard to whether fleeing the jurisdiction, working under aliases and evading law enforcement officials are types of conduct that are inherent in the crime of failure to appear.

"inherent" in the offense of failure to appear. Quite the contrary, we find that such conduct is classic obstructive conduct.

Accordingly, we find no error in the district court's decision to enhance Magluta's base offense level for obstructing justice.

4.      Criminal history category departure in the <u>bond jumping</u> case

Magluta argues that the district court erroneously departed upward on his criminal history category in the bond jumping case because the bases which the district court used to depart were already used in departing in the false identifications case. We review the district court's decision to depart under the abuse of discretion standard. See <u>Hoffer</u>, 129 F.3d at 1199.

Contrary to Magluta's argument, we do not find that the district court relied on identical facts to support a risk of recidivism finding in both cases. The record shows that while granting the government's motion for an upward departure in the bond jump case, the district court relied on the risk of recidivism as suggested by Magluta's past and present bond jumps. In making a criminal history category departure in the false identification case, however, the district court relied on the risk of recidivism, as shown partly by Magluta's post-flight conduct of obtaining more false identifications, to support a criminal history departure.

The crimes to which the particular recidivism risk applies are different: in the

bond jump case, the risk of recidivism relates to the chance that Magluta will jump bond in the future. In the false identification case, the recidivism risk relates to the chance that Magluta will possess and/or use more false identifications in the future. Due to this critical distinction, we conclude that the district court relied on different factual bases while departing from Magluta's criminal history category. More importantly, we do not find that the district court abused its discretion while departing upward.

D.     Consecutive supervised release

The district court also imposed a three year supervised release in both cases to be served <u>consecutively</u>. As Magluta and the government correctly point out, "any term of supervised release imposed is to run concurrently with any other term of supervised release imposed." <u>See</u> 18 U.S.C. § 3624(e) ("The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release"); U.S.S.G. § 5G1.2 comment. Accordingly, we vacate the sentence of consecutive term of supervised release and remand for re-sentencing.

## V.  CONCLUSION

We affirm the conviction in the false identification case. However, we must

vacate the sentences entered in both cases, and remand for re-sentencing.

In the false identification case, the district court should address on remand whether the six-level upward departure in the base offense level can be supported by the factors listed in § 5K2.7 and 2.9. Similarly, the district court should also determine whether the three-level upward criminal history departure can be supported based on Magluta's acts that were not part of his "offense" as defined in the Guidelines.

In the bond jumping case, Magluta's adjusted base offense level must be recalculated by only enhancing the base offense level by six levels, and not nine.

Lastly, the sentence of consecutive supervised release is vacated. The supervised release should run concurrently as directed by the Guidelines.

AFFIRMED in part, VACATED and REMANDED in part.