**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BUCK LEON HAMMERS,

    Defendant - Appellant.

No. 18-7051

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:17-CR-00033-RAW-1)**

_____

Ryan A. Ray, Norman Wohlgemuth Chandler Jeter Barnett & Ray, Tulsa, Oklahoma, for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney (Brian J. Kuester, United States Attorney, and Robert A. Wallace, Assistant United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **EID**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

Defendant-Appellant Buck Leon Hammers used to be the Superintendent of the

Grant-Goodland Public School District in Grant, Oklahoma. That is, until he was

charged with conspiring with his secretary to commit bank fraud and embezzle federal

program funds. Prior to trial, the Government moved to exclude a suicide note written by Defendant's secretary and co-conspirator, Pamela Keeling. In that note, Ms. Keeling took full responsibility for the fraud and exculpated Defendant of any wrongdoing. The district court granted the Government's motion and prohibited Defendant from introducing the note at trial. The jury subsequently convicted Defendant of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and conspiracy to embezzle federal program funds in violation of 18 U.S.C. § 371. The jury acquitted Defendant on the seven substantive counts of embezzlement and bank fraud.

On appeal, Defendant asserts: (1) the district court erred in excluding Ms. Keeling's suicide note; (2) the Government did not present sufficient evidence to obtain a conviction; (3) the Government committed prosecutorial misconduct; and (4) the district court committed procedural error at sentencing. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

In August 2001, Defendant became the Superintendent of Grant Schools. Eight years later, Grant Schools consolidated with the Goodland School District, creating the Grant-Goodland Public School District ("Grant-Goodland"). Beginning in 2011, the auditing firm for Grant-Goodland noticed deficiencies in Grant-Goodland's invoicing process. Although the firm noted the deficiencies in Grant-Goodland's audit and made recommendations for improvement, the deficiencies persisted through subsequent audits in 2012, 2013, and 2014.

By 2014, the continued deficiencies raised more serious concerns as auditors began to suspect fraud at Grant-Goodland. Initially, the auditors were concerned with fourteen large purchase orders totaling $386,211. The auditors were troubled by the fact that the purchase orders did not have "actual original invoices with letterhead and normal business information." In light of their concerns, the auditors examined all checks issued to the vendors identified in the fourteen large transactions. The auditors determined the checks to these vendors were written as a group together, each month, on the same date. Each of the checks was endorsed by both the vendor, and then, a school official. The checks were cashed within minutes of each other, at the same bank, on the same day they were issued. Because many of these vendors were located out of town, the auditors found it unlikely the checks could have been issued, mailed, and cashed in such a short amount of time. Having validated their suspicions, the auditors notified the United States Department of Education Office of Inspector General Investigation Services ("OIG"), which initiated the federal investigation in this case.

On January 28, 2016, agents from the FBI and the OIG executed a search warrant at Grant-Goodland's administrative office and seized 36 boxes of documents as well as electronic files. Sometime thereafter, Ms. Keeling informed Jimmie Sue Miller—who was her aunt and the school board treasurer—she intended to tell authorities she "did it." On February 1, 2016, the Grant-Goodland school board suspended Defendant and Ms. Keeling for their alleged roles in the scheme to defraud the district by

3

falsifying invoices and check endorsements. Ms. Keeling committed suicide the next day.

Before taking her own life, Ms. Keeling left four suicide notes laying on a bible—three to her family and one "to whom it may concern" at Grant-Goodland. The letter to whom it may concern at Grant-Goodland read as follows: "I Pam Keeling take full responsibility for everything at Grant School. No vendor nor Mr. Hammers had anything to do with what happened. I am truly sorry and pray for forgiveness."

## II.

Prior to trial, the Government filed a motion in limine to exclude the suicide note from evidence, arguing the note is inadmissible hearsay. In response, Defendant argued the note qualifies as a statement against interest and is also admissible under the residual exception to the hearsay rule. *See* Fed. R. Evid. 804(b)(3); Fed. R. Evid. 807. At the pretrial hearing, the district court granted the Government's motion in limine but left its decision open to reconsideration depending on the evidence presented at trial. At trial, defense counsel revisited the issue and the district court reiterated its decision to exclude the note.

In making its decision, the district court reasoned the suicide note was not a statement against interest because "penal interest is of no interest—is of no moment to a dead man." The court further held the note was not "corroborated by circumstances clearly indicating its trustworthiness." Having determined the note was not corroborated by circumstances clearly indicating its trustworthiness, the district court also held the note could not be admitted under the residual exception.

4

Despite its decision to exclude the note, the district court permitted defense counsel to question Ms. Keeling's aunt, Jimmie Sue Miller, regarding Ms. Keeling's confession that she "did it." The district court admitted the confession pursuant to the statement against interest exception because there were corroborating circumstances with respect to Ms. Keeling's statement to her aunt, in contrast to the suicide letter. Specifically, the district court found Ms. Keeling's statement that she "did it" was corroborated by the Government's evidence, which was "very much based upon Ms. Keeling's involvement." Although defense counsel originally intended to call Ms. Miller to testify regarding Ms. Keeling's confession, counsel ultimately determined calling Ms. Miller would not be in Defendant's best interest.

After the Government rested its case, Defendant moved for a judgment of acquittal on all counts, which the district court denied. Subsequently, Defendant testified in his own defense. At the close of all evidence, Defendant renewed his motion. The district court denied the motion on the same grounds finding, in the light most favorable to the Government, a rational trier of fact could find every element of the crimes charged beyond a reasonable doubt. After nearly seven hours of deliberation, the jury returned a guilty verdict on counts one and two, charging conspiracy to commit bank fraud and conspiracy to embezzle federal program funds. The jury acquitted Defendant on counts three through nine, alleging bank fraud and embezzlement.

Following the trial, the United States Probation Office prepared a presentence report ("PSR"). In the final PSR, the United States Probation Office recommended the

5

court apply a two-level obstruction of justice enhancement based on Defendant's alleged perjury at trial. At sentencing, the district court found by a preponderance of the evidence Defendant committed perjury and applied the enhancement over Defendant's objection.

The district court also considered Defendant's motion for a downward variance and the Government's motion for an upward departure at sentencing. After consideration, the court granted the Government's motion in part and imposed a two-level upward departure. Based on that departure, the district court calculated an adjusted guideline range of 87 to 108 months. Ultimately, the district court imposed a sentence at the high end of the guideline range, sentencing Defendant to 108 months on both counts 1 and 2 to run concurrently. The district court also imposed a three-year term of supervised release on each count to run concurrently.

## III.

Defendant raises four issues on appeal. First, he argues the district court erred in excluding Ms. Keeling's suicide note. Next, he maintains the Government did not present sufficient evidence to obtain a conviction. Third, he alleges the Government committed prosecutorial misconduct. Finally, he contends the district court committed procedural error at sentencing. We address each issue in turn.

## A.

First, Defendant argues the district court erred in excluding Ms. Keeling's suicide note at trial. Defendant further argues the exclusion of the note violated his constitutional right to present a defense. We review the district court's evidentiary

6

rulings for an abuse of discretion. *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005). When a defendant alleges the district court's evidentiary ruling deprived him of his constitutional right to present a defense, we review the constitutionality of the ruling de novo. *Id.*

1.

Turning first to whether the district court abused its discretion in excluding the suicide note, Defendant argues the district court should have admitted the suicide note as a statement against interest pursuant to Federal Rule of Evidence 804(b)(3) or, in the alternative, under the residual exception pursuant to Federal Rule of Evidence 807.

Under Rule 804(b)(3), a statement against the declarant's interest is not excluded as hearsay if it is sufficiently reliable. Rule 804(b)(3) covers only those statements that are "individually self-inculpatory." *United States v. Smalls*, 605 F.3d 765, 781 (10th Cir. 2010) (citing *Williamson v. United States*, 512 U.S. 594, 599 (1994)). We have rejected the notion "that an entire narrative, including non-self-inculpatory parts (but excluding the clearly self-serving parts . . .) may be admissible if it is in the aggregate self-inculpatory." *Smalls*, 605 F.3d at 781 (citing *Williamson*, 512 U.S. at 601).

In this case, only the portions of the suicide note specifically inculpating Ms. Keeling are eligible for analysis under Rule 804(b)(3). The statement exculpating Defendant—no vendor nor Mr. Hammers had anything to do with what happened—is not a statement against interest because it is not self-inculpatory. Therefore, the Rule

7

804(b)(3) analysis applies only to the statement: "I Pam Keeling take full responsibility for everything at Grant School . . . I am truly sorry and pray for forgiveness."

Undertaking such analysis here, Rule 804(b)(3) requires three things: (1) the declarant is unavailable; (2) a reasonable person in the declarant's position would not have made the statement unless she believed it to be true because, when made, it exposed the declarant to criminal liability; and (3) the statement is supported by "corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3). There is no question Ms. Keeling was unavailable because she was deceased at the time of trial. Therefore, at issue is: (1) whether the statement exposed Ms. Keeling to criminal liability such that she would not have made the statement unless she believed it to be true; and (2) whether the statement is supported by corroborating circumstances that clearly indicate its trustworthiness.

To determine whether a reasonable person in the declarant's position would not have made the statement unless she believed it to be true, courts consider "the statement in context and the circumstances under which it was made." *United States v. Lozado*, 776 F.3d 1119, 1125 (10th Cir. 2015). If evidence of the declarant's state of mind is available, and the declarant subjectively believed the statement would not expose her to criminal liability, it is not a statement against interest. *Id.* at 1128.

The district court found the statement was not against Ms. Keeling's penal interest because "penal interest . . . [is] of no moment to a dead man." *See United States v. Lemonakis*, 485 F.2d 941, 956 n.24 (D.C. Cir. 1973). We conclude the district court did not abuse its discretion in so holding. Ms. Keeling appears to have written the note

8

in anticipation of her imminent death. While Defendant stresses the rule requires the statement be against the declarant's penal interest *when it is made*, the record indicates Ms. Keeling had no intention of sticking around to face criminal prosecution. For example, the other notes found with the inculpatory note were good-byes to her family. Additionally, the letters were found in Ms. Keeling's motorhome—the same place she committed suicide. Therefore, at the time she wrote the note, one cannot seriously argue Ms. Keeling subjectively believed the statement would expose her to criminal liability. For that reason, the district court did not abuse its discretion in finding Ms. Keeling's suicide note was not against her penal interest. *See Lozado*, 776 F.3d at 1128.

Even assuming Ms. Keeling's inculpatory statement was sufficiently against her penal interest to meet the requirements of Rule 804(b)(3), we cannot find the district court abused its discretion in finding the statement was not sufficiently corroborated. Although this Court has not "squarely addressed how a statement must be corroborated," we have held "the declarant's credibility and the circumstances of the statement bearing on its truthfulness can both be considerations." *Lozado*, 776 F.3d at 1132. Additionally, a "close relationship between the declarant and the defendant can damage the trustworthiness of a statement." *Id.* at 1133.

Here, the district court questioned whether Ms. Keeling was in a rational state of mind shortly before committing suicide.[1] The district court also noted Ms. Keeling had been dishonest and untrustworthy in committing the charged fraud, and therefore,

---

[1] As the district court made clear, the concerns regarding Ms. Keeling's rationality in this case do not amount to a *per se* rule that suicide notes are always irrational.

her believability is "subject to question." Finally, the district court raised concerns that Ms. Keeling was trying to "re-write history . . . perhaps wanting to take guilt on [herself] to clear someone that [she] may have some close relationship with."[2] Based on this record, we cannot find the district court abused its discretion in finding Ms. Keeling's statement was not sufficiently corroborated.

Even if Ms. Keeling's statement was not admissible under 804(b)(3), Defendant urges it should have been admitted under the residual exception contained in Federal Rule of Evidence 807. The residual exception should only be used "in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice." *United States v. Dalton*, 918 F.3d 1117, 1133 (10th Cir. 2019) (citing *United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1995)). Courts must use caution in applying the residual exception because "an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule." *Tome*, 61 F.3d at 1452.

In this case, the district court decided to exclude the suicide note under the residual exception because the note did not offer guarantees of trustworthiness. We do not find the district court abused its discretion in so holding. As already discussed, Ms. Keeling and Defendant had a close relationship, which potentially motivated Ms.

---

[2] This factual finding is supported by the following testimony at trial: "[Defendant and Ms. Keeling] had what I observed to be a relationship that was personal," "they were comfortable around each other . . . they told each other everything and were . . . friends," "they had known each other forever," and "[Ms. Keeling] would have done anything for him."

Keeling to exculpate Defendant before taking her own life. Moreover, Ms. Keeling's prior statements and actions with respect to the charged fraud cast doubt on her honesty and trustworthiness.[3]

Nevertheless, Defendant argues a note, voluntarily written, in close proximity to one's death has an "indicia of reliability" because "the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of oath." *See Miller v. Stovall*, 742 F.3d 642, 650 (6th Cir. 2014) (citing *Idaho v. Wright*, 497 U.S. 805, 820 (1990)). While Defendant's reasoning may be persuasive, it is not dispositive. Although reasonable minds may differ, the district court's factual findings were supported by the record and its legal conclusions were not contrary to the established law. Therefore, we find the district court did not abuse its discretion in declining to admit the suicide note under the residual exception.

2.

Next, we turn to Defendant's second argument—that is, that the exclusion of the note violated his right to present a defense. While a defendant has a Fifth and Sixth Amendment right to present a defense, that right is not absolute. *Dowlin*, 408 F.3d at 659. "The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)

---

[3] We note the district court found the Government's evidence corroborated Ms. Keeling's statement to her aunt but did not corroborate the suicide note. Despite this inconsistency, the unique circumstances surrounding the suicide note support our conclusion that there was no abuse of discretion in finding lack of corroboration.

(citing *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). For example, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, *or otherwise inadmissible under standard rules of evidence*." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (emphasis added).

To demonstrate his right to present a defense was violated, Defendant must show: (1) the district court abused its discretion in excluding the evidence at issue; and (2) the excluded evidence was "of such an exculpatory nature that its exclusion affected the trial's outcome." *United States v. Tapaha*, 891 F.3d 900, 905 (10th Cir. 2018) (citing *Dowlin*, 408 F.3d at 659). Because we find the district court did not abuse its discretion in excluding the note, we need not address whether the excluded evidence was of such an exculpatory nature that its exclusion affected the outcome of the trial. In either case, the district court did not violate Defendant's right to present a defense.

B.

Next, Defendant argues the Government presented insufficient evidence to convict him of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and conspiracy to embezzle federal program funds in violation of 18 U.S.C. § 371. We review the sufficiency of the evidence de novo to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. *United States v. Marquez*, 898 F.3d 1036, 1040 (10th Cir. 2018). We consider all the evidence, along with reasonable inferences taken therefrom, in the light most favorable to the government. *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009). On appeal, we do not "assess the credibility of witnesses or weigh conflicting evidence, as these tasks are

12

exclusively for the jury." *Id.* (citing *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)). Rather, we "merely determine whether a rational trier of fact could have found 'the essential elements of the crime beyond a reasonable doubt.'" *Winder*, 557 F.3d at 1137 (citing *Bowen*, 527 F.3d at 1076).

To prove conspiracy to embezzle federal program funds under 18 U.S.C. § 371, the Government must show: (1) Defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among co-conspirators. *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000). To prove conspiracy to commit bank fraud under 18 U.S.C. § 1349, the Government must show: (1) Defendant agreed with at least one other person to commit bank fraud; (2) one of the conspirators committed an overt act in furtherance of the conspiracy; (3) Defendant knew the essential objective of the conspiracy; (4) Defendant knowingly and voluntarily participated in the conspiracy; and (5) there was interdependence among co-conspirators. *See* 18 U.S.C. § 1349; 18 U.S.C. § 1344; 18 U.S.C. § 371. In either case, Defendant argues the Government failed to prove he specifically agreed to defraud or embezzle, or that he knowingly and voluntarily participated in the illegal activity.

Here, resisting Defendant's suggestion that we weigh conflicting testimony or evaluate the credibility of the witnesses, we conclude the Government presented sufficient evidence to support a guilty verdict on both conspiracy counts. This evidence is as follows. Defendant is well-educated and trained in school financial administration. Along with being the superintendent, Defendant was the purchasing

13

agent for Grant-Goodland, responsible for identifying the vendors who would provide goods and services to the school. In that capacity, Defendant was tasked with approving the school's purchases, reporting to the school board regarding those purchases, and answering any questions raised thereby. In spite of these responsibilities, Grant-Goodland prepared hundreds of fraudulent purchase orders reflecting hundreds of thousands of dollars' worth of goods and services that were never provided to the school.

Although Grant-Goodland's auditors did not immediately realize the school was producing fraudulent purchase orders, the auditors did identify specific problems with Grant-Goodland's purchasing process starting in 2011. The auditors informed Defendant of those deficiencies, and in fact, Defendant was listed as the contact person on Grant-Goodland's corrective action plan. Despite Defendant's training in school financial administration and knowledge of the deficiencies in the school's purchasing process, the problems identified in 2011 persisted through the 2014 fiscal year.

In that time, Grant-Goodland produced hundreds of fraudulent checks based on the fraudulent purchase orders—purchase orders that were allegedly, and should have been, approved by Defendant. Despite being written to primarily out-of-town vendors, the fraudulent checks were cashed at local banks, and many of the checks bore Defendant's signature as the last endorser. While Defendant contests the endorsements reflect his genuine signature, the bank vice president testified, per bank policy, the checks should not have been cashed unless Defendant, as the last endorser, was

present.[4] Additionally, multiple lay witnesses testified the signature appeared to be Defendant's based upon their familiarity with Defendant's signature generally.[5] Finally, Defendant's account number is written on at least one fraudulent check for $2,900, and a bank teller testified Defendant cashed at least "some checks" with them.

While Defendant testified in his own defense and urged Ms. Keeling acted alone, the jury could have found his testimony less than credible when he, for example, disclaimed knowledge of $28,000 worth of fraudulent checks approved *at the same school board meeting* where he recommended laying off two teachers and combining classes due to negative balances. A reasonable jury could have rejected Defendant's explanation that he trusted Ms. Keeling completely and overlooked the hundreds of thousands of dollars spent on non-existent school improvements. Based on all the evidence, a reasonable juror could infer Defendant: (1) specifically agreed to commit bank fraud and embezzle federal program funds; and (2) acted in furtherance of that agreement. Consequently, Defendant's conviction must stand.

## C.

Third, Defendant argues he was denied due process due to prosecutorial misconduct. Specifically, Defendant identifies six statements made by the Government which he alleges constitute reversible prosecutorial misconduct.

---

[4] We note several bank tellers testified they did not consistently enforce this policy. Nevertheless, it is within the province of the jury to weigh the evidence.

[5] We note the handwriting expert's findings were inconclusive. The handwriting expert explained he could not make a determination because the checks he examined were electronic copies, not originals.

15

A prosecutor's misconduct may render a trial "so fundamentally unfair as to deny [a defendant] due process." *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018) (quoting *Littlejohn v. Trammell*, 704 F.3d 817, 837 (10th Cir. 2013)). To determine whether a prosecutor's comments rendered a defendant's trial fundamentally unfair, the court: (1) "decides whether the prosecutor's comments were improper"; and (2) if so, examines the comments likely effect on the jury's verdict. *United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019).

Turning to the first prong, "courts have struggled to determine when a prosecutor's statements are improper." *Id.* While any improper comments should be examined in context, courts have recognized prosecutorial comments may be improper when they refer to matters not in the evidence or distort the record by misstating the evidence. *Id.* 824-25. Once the court finds the prosecutor made an improper comment, the court then "assesses whether the comment affected the jury's verdict." *Id.* at 825. To determine whether comments affected the jury's verdict, courts consider the trial in its entirety, including "the extent of the misconduct, and the role of the misconduct within the case," as well as "[t]he prevalence and degree of improper statements." *Id.* at 826 (citing *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996)). "Absent prejudice, a prosecutor's improper statements alone will not require a new trial." *Christy*, 916 F.3d at 826 (citing *United States v. Sorensen*, 801 F.3d 1217, 1242-43 (10th Cir. 2015)).

Defendant objected to each of the six alleged improper statements, and the district court overruled each objection. Therefore, we conduct a de novo review for

16

error.  *See Christy*, 916 F.3d at 826 (citing *United States v. Anaya*, 727 F.3d 1043, 1052 (10th Cir. 2013)).

1.

Here, Defendant first argues the Government misstated the evidence during cross examination of Defendant when the prosecutor stated:

1. Corey Dawson "recognized your signature" on the forged checks;

2. "Your signature appears on all of those checks according to [Corey Dawson]";

3. Sandy Storie "has seen your signature all over the place and she says that's your signature on that check"; and

4. Sandy Storie "said that looked like your signature to her," to which Defendant responded, "it's not my signature," and the prosecutor stated, "that's not what she said."

In each of these statements, Defendant argues the Government implied Corey Dawson and Sandy Storie *knew* it was Defendant's signature on the checks, when in fact they testified it *appeared* to be Defendant's signature.  Both Corey Dawson and Sandy Storie testified they could not say with certainty Defendant signed the checks at issue.  Nevertheless, we do not find the Government misstated the evidence in this cross examination.  The Government need not qualify each of the above statements with "alleged" or "purported" signature.

Moreover, even if the Government's cross examination slightly misconstrued the witnesses' testimony, it is inconceivable to suggest these misstatements influenced the jury's verdict.  These minor misstatements occurred during the cross examination

17

of a single witness during a three-and-a-half-day trial. Both Corey Dawson and Sandy Storie were cross examined at length, and the jury heard extensive evidence with respect to whether it was truly Defendant's signature on the fraudulent checks. In sum, it defies logic to believe the jury's verdict would have been different but for these statements. Therefore, even if the Government's statements were improper—which they were not—Defendant was not prejudiced by them. Accordingly, these statements do not require reversal.

2.

Next, Defendant argues the Government misstated the evidence when the prosecutor stated Nancy Hughes "testified that the MAS system is Cloud based, which means you could reach it from any computer." Defendant argues the Government's statement mischaracterized the evidence because Ms. Hughes testified the MAS system had only been Cloud-based for "the last couple years." Because Defendant was not working at Grant-Goodland in the last couple years, Defendant argues the Government's statement is a material misstatement of the evidence.

Although we find the Government's statement was misleading to the extent that no Cloud-based MAS program existed during Defendant's tenure with Grant-Goodland, we also conclude Defendant suffered no prejudice by the mischaracterization. In the course of a three-and-a-half-day trial, this single comment does not affect the overwhelming weight of the evidence. Moreover, when defense counsel objected to the misstatement he also provided his characterization of the evidence—that is, defense counsel stated in front of the jury that Ms. Hughes testified

18

"it was Cloud based the last two years, but before that it was not Cloud based."

Defendant then stated, "I haven't been at [Grant] the last two years." Therefore, the jury heard both characterizations of the evidence simultaneously along with Defendant's statement that he was not employed by Grant-Goodland when MAS was Cloud-based. When ruling on the objection, the district court explicitly stated, "it is up to the jury" to evaluate the evidence. With this additional information and instruction, the jury was able to fairly evaluate the evidence when reaching its verdict. Therefore, we find these statements did not prejudice Defendant, and so, there is no reversible error.

3.

Finally, Defendant argues the Government's statements during closing arguments were improper when the prosecutor stated:

> Did [Defendant] leave at noon? Yep. He took a check, left at noon, went to the bank and cashed it and went to the ranch. Look at the time stamps on the checks. They are not all in the afternoon, but most of them are. He told you what he did. Left the school with a check, went to the bank and cashed it.

Defendant argues these statements reflect the Government's opinion and are not supported by evidence in the record.

While we recognize the Government is entitled to "a reasonable amount of latitude in drawing inferences from the evidence" during closing arguments, this latitude "does not extend to improper suggestions, insinuations or assertions." *United States v. Manriquez Arbizo*, 833 F.2d 244, 247 (10th Cir. 1987). In this case, we need not decide whether the Government's statement was improper because, either way, the

19

statement was not prejudicial. In the context of the entire record, the Government's statement was "not so egregious as to influence the jury to convict [Defendant] on evidence not in the record." *See id.* at 248. The Government presented substantial evidence with respect to Defendant's guilt and the district court instructed the jury that counsel's arguments were not to be considered as evidence. Accordingly, we find the Government's statement during closing argument was not prejudicial, and therefore, does not require reversal.

D.

Finally, Defendant argues the district court committed procedural error in sentencing. Specifically, Defendant argues the district court erred in applying: (1) the obstruction-of-justice enhancement; and (2) the disruption-of-governmental-function upward departure. When a defendant challenges the district court's application of the sentencing guidelines, "we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (citing *United States v. Munoz-Tello*, 531 F.3d 1174, 1181 (10th Cir. 2008)).

1.

First, Defendant argues the district court erred in applying the obstruction-of-justice enhancement based on his alleged perjury at trial. Under the obstruction-of-justice enhancement, if a defendant willfully obstructs or impedes the administration of justice with respect to the prosecution of the charged offense, the district court must increase the offense level by two levels. U.S.S.G. § 3C1.1. Before the district court

20

can apply the enhancement, it must find all three elements of perjury—that is: (1) a false statement under oath; (2) concerning a material matter; (3) with the willful intent to provide false testimony. *United States v. Hawthorne*, 316 F.3d 1140, 1146 (10th Cir. 2003). The district court must also "be explicit about which representations by the defendant constitute perjury." *Id.*

Here, the district court explained its decision to apply the obstruction-of-justice enhancement as follows:

> The defendant's testimony regarding the presence of his signature on numerous checks used to carry out the fraud conspiracies in this case was directly contradictory to testimony of other witnesses and the evidence presented in this case. His denial of any involvement in the scheme to defraud Grant Public Schools was a willful attempt by the defendant to obstruct justice in this case and not a result of confusion, mistake, or faulty memory. Therefore, the Court finds by a preponderance of the evidence that the defendant was appropriately given a two-level enhancement for obstruction.

Upon the Government's inquiry, the district court clarified its findings and specifically stated Defendant lied with respect to: (1) his signature on the checks; (2) his receipt of embezzled funds; and (3) his blatant denial of any involvement in the scheme to defraud. The district court also indicated "it's pretty much the whole kit and kaboodle." While it is not entirely clear what this last statement means, it seems to indicate the district court believed the entirety of Defendant's testimony was perjured.[6]

---

[6] We note that the district court's "whole kit and kaboodle" statement standing alone would run afoul of *Hawthorne* because it does not specifically identify the portion of perjured testimony. *See Hawthorne*, 316 F.3d at 1146.

Reviewing the court's decision, we conclude the district court made the requisite findings to apply the obstruction-of-justice enhancement. It found Defendant made false statements with respect to: (1) his signature on the checks; (2) his receipt of embezzled funds; and (3) his involvement in the scheme to defraud. It goes without saying these perjured statements are material to the charged offenses, and the district court determined the statements were made willfully.[7]

Nevertheless, Defendant argues no factual basis exists for the district court's findings. Reviewing the district court's factual findings for clear error, we find the record adequately supports the district court's determinations. While no one witness could say with 100% certainty Defendant signed the checks, numerous witnesses testified the signature appeared to be Defendant's based on their familiarity with Defendant's signature generally. While the handwriting expert's findings were inconclusive, the handwriting expert explained he could not make a determination because the checks were photocopies rather than original documents. With respect to receipt of embezzled funds, although the Government could not trace the proceeds to Defendant directly, a bank teller testified Defendant cashed at least some checks, and his bank account number was written on the back of a fraudulent check for $2,900.

---

[7] Material evidence is testimony that "if believed, would tend to influence or affect the issue under determination." *United States v. Miranda*, 15 F. App'x 674, 677 (10th Cir. 2001) (affirming enhancement even when the district court did not explicitly find materiality). Although the district court did not make an explicit finding regarding materiality, we have previously affirmed an obstruction-of-justice enhancement when the finding was "implicit." *See Hawthorne*, 316 F.3d at 1146. Here, Defendant's testimony that he did not sign any fraudulent checks or receive any embezzled funds is unquestionably material to the charged offenses.

Based upon this evidence and the record as a whole, we find no clear error with respect to the obstruction-of-justice enhancement.

2.

Finally, Defendant argues the district court erred in applying the disruption-of-governmental-function upward departure. Guideline section 5K2.7 provides "[i]f the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected." U.S.S.G. § 5K2.7. Departures are not justified, however, "when the offense of conviction is an offense such as bribery or obstruction of justice" because "interference with a governmental function is inherent in the offense." *Id.*

In this case, Defendant argues disruption of a government function is inherent in the offense of conviction—embezzlement of federal program funds. Defendant cites no authority for his proposition, and although we have not directly addressed the issue, other circuits have applied the enhancement in similar cases. *See United States v. Gunby*, 112 F.3d 1493, 1500 (11th Cir. 1997) (applying section 5K2.7 to convictions for tax fraud); *United States v. Khan*, 53 F.3d 507, 518 (2d Cir. 1995) (applying section 5K2.7 to Medicare fraud). We are persuaded by the logic those courts applied.

Specifically, the Sentencing Commission explicitly excluded the application of section 5K2.7 to bribery and obstruction of justice offenses. If the Commission wanted to preclude the application of section 5K2.7 to embezzlement offenses, it could have done so. It did not. *See Gunby*, 112 F.3d at 1500. Furthermore, Defendant was

23

sentenced pursuant to Guideline 2B1.1. This guideline provision does not explicitly account for an interference with the administration of a government program. *Khan*, 53 F.3d at 518. Therefore, reviewing the legal question de novo, we find application of section 5K2.7 was proper.

Nevertheless, Defendant argues even if application of section 5K2.7 is generally proper, the record does not support the factual basis underlying the departure in this case. Reviewing the district court's factual findings for clear error, we find the district court adequately supported its application of 5K2.7. The district court reasoned:

> The conspiracies for which the defendant was convicted resulted in significant monetary loss to the school district. As a result, the defendant's actions led to state intervention by the Oklahoma State Department of Education on March 24, 2016. The State Department of Education memorandum dated June 23, 2016 specifically cites their road to intervention began due to the financial mismanagement of Grant Public Schools, which would be attributed to the actions of the defendant. Further, the order granting state intervention was based upon the district's failure to meet financial requirements . . . . The state's intervention was after the defendant's fraudulent conduct in this case which resulted in excess of $1 million loss to the school district from June 2010 to January 28, 2016. Therefore, based on the evidence in this matter, the defendant's fraudulent scheme was significant in the board's decision to annex Grant Goodland's Public Schools into the Hugo Public School System. The defendant's conduct did far more than simply contribute to the closing of a school. It caused the loss of employment and morale of the teachers and staff at Grant Public Schools. It damaged the local school patrons' confidence in the function of local government. The consolidation of Grant Public Schools into the Hugo Public School system disrupted the function of the Hugo Schools and required them to accommodate additional students into its system. The nature and extent of the disruption caused by the defendant in this case was significant as it caused permanent damage to Grant Public Schools, Hugo Public Schools, and all of its teachers, students, and staff, as well as the confidence of the community in their local government functions.

Based on these findings, the district court imposed a two-level upward departure. Our review of the record convinces us these factual findings are well supported. While the State Department of Education memorandum identifies other problems at Grant-Goodland, it repeatedly addresses the financial mismanagement of the school. Financial mismanagement need not be the sole factor for the annexation for the district court to determine Defendant's actions substantially disrupted government functioning. In fact, the district court acknowledged the State Department of Education memorandum identified other issues at Grant-Goodland, including its failure to meet accreditation standards. Nevertheless, based on the evidence before it, the district court found Defendant's actions substantially contributed to the annexation and interrupted government functioning. Based on these findings and the record as a whole, we find the district court did not err in applying the disruption-of-governmental-function upward departure.

***

For the reasons provided herein, Defendant's conviction and sentence are affirmed.